## CAPITOL RECORDS, Inc. v. MERCURY RECORD CORP.

United States District Court
S. D. New York.
Sept. 26, 1952.

Arthur E. Garmaize, New York City, for plaintiff (Morris Einhorn, New York City, on the brief).

Paul J. Kern, New York City, for defendant (Bernard Colton, New York City, on the brief).

LEIBELL, District Judge.

This is an action for a declaratory judgment under Section 2201 of Title 28 U.S.C. The complaint alleges (paragraph 1) that—

"* * * there is an actual controversy now existing between the parties involving an agreement respecting the possession and the right to the use of certain matrices for the manufacture of phonograph records from which matrices the defendant is manufacturing phonograph records and is employing unfair methods of competition in the distribution of such phonograph records. * * *"

That there is diversity of citizenship and the statutory amount in controversy, and that both plaintiff and defendant are doing business in this district, is alleged in paragraphs 2 and 3. Plaintiff, in addition to a judgment declaring that it—

"is entitled to the possession and the use in the manufacture and distribution of phonograph records of matrices and their derivatives and duplicates of recording at any time and in any manner made by Telefunkenplatte, G.m.b.H., and to the use of the name in any combination of 'Telefunken' in connection therewith,"

also seeks injunctive relief, the impounding of the matrices, derivatives, duplicates and copies, and that defendant be required to pay plaintiff damages and account for the profits of defendant's alleged illegal use of the matrices.

Defendant's answer contains denials and special defenses; also a counterclaim for an injunction, the impounding of plaintiff's matrices, duplicates and copies, for damages and an accounting of plaintiff's profits. After several pretrial hearings the attorneys agreed upon a stipulation of facts and stipulated as to the admissibility of a number of exhibits. The case was then submitted on the stipulation of facts and the exhibits. The controversy between the parties has arisen because each claims the right to manufacture and sell in this country certain phonograph records produced from matrices of recordings made by foreign artists for Telefunkenplatte, G.m.b.H. (hereinafter called Telefunken) during the Nazi regime in Germany.

After the German Nazis took over control of Czechoslovakia, Telefunken entered into an agreement with Ultraphon Actien Gesellschaft Fur Grammophon Industrie Und Handel of Prague (hereinafter referred to as Ultraphon) under which Ultraphon was authorized to manufacture phonograph records from certain Telefunken matrices, and sell the records within the territorial borders of Czechoslovakia (Ex. J). When Nazi Germany capitulated at the end of World War II, the property of Germans in Czechoslovakia was seized by the Government. In 1945 Czechoslovakia issued confiscation and nationalization decrees. Supplemental decrees specifically took over the matrices in the possession of Ultraphon which were later transferred to a Czechoslovakian instrumentality known as Gramophone. On November 6, 1947, Gramophone entered into two agreements which made available to Keynote Recordings, Inc. and defendant, Mercury Record Corporation, certain of the matrices of Telefunken recordings, so that the matrices could be used in the United States by defendant for the manufacture and sale of phonograph records.

Plaintiff, Capitol Records, Inc., entered into an agreement (Ex. S) with Telefunken on October 1, 1948, by which plaintiff acquired the right to import certain Telefunken matrices and manufacture therefrom phonograph records for sale in the United States of America and the Western Hemisphere. Plaintiff's agreement with Telefunken was executed with the approval of the Joint Export-Import Agency, Berlin

334

Branch, United States Sector, where Telefunken is located.

The above is a general outline of the controversy between the parties. The important details will be selected from the stipulation of facts and the exhibits, and will be hereinafter discussed.

The defendant has raised, in its brief, the absence from the record herein of certain alleged indispensable parties—Telefunken, Gramophone, and the artists who made the recordings for Telefunken. This question—the alleged failure to join indispensable parties, Rule 12(b), Fed.Rules Civ. Proc. 28 U.S.C., was not raised by defendant's answer served April 25, 1949, or by any formal motion; but it was not thereby waived. Rule 12(h).

The artists are not indispensable parties. They assigned all their rights to Telefunken. The arrangement between Telefunken and the singer, instrumentalists, orchestras, bands, conductors and other artists are set forth in paragraphs (h), (i) and (j) of the stipulation of facts herein:

"(h) Prior to and since 1941, Telefunken, by agreements, engaged singers, instrumentalists, orchestras, bands, conductors and elocutionists and other artists of established reputation to sing, play, conduct and recite for sound recording purposes exclusively for Telefunken and to vest in Telefunken the exclusive right for all time to manufacture, distribute, sell and advertise, and to license the manufacture, distribution, sale and advertising in all parts of the world of phonograph records of such artists' interpretative performances together with the exclusive right to use in commerce and trade and for advertising purposes the name and photographs of such artists and to license such use.

"(i) Such agreements provide for the payment by Telefunken of varying sums of money as immediate consideration, or in addition to royalties or as annual guarantees upon royalties based upon the number of phonograph records containing the artists' interpretative performances manufactured or sold.

"(j) Telefunken entered into written agreements on dates and with artists as follows. The contracts are what they purport to be:"

Certain written agreements with the artists are Exhibits A to I of the group of exhibits, the admissibility of which has been stipulated under paragraph 4 of the pretrial order. The contracts with the artist, Erna Sack, (Exs. B, D) contained the provision:—

"You [Erna Sack] transfer and assign to us herewith, all your copyrights, author's rights and other rights vested in you on basis of your personal appearance for our recording purposes, including in particular the recordings and other mechanical devices made by us, without any restriction and for all countries. This transfer and assignment refers also to all rights which may be newly vested in you in the future, pursuant to any change or amendment of the laws."

The contract with Erich Kleiber, General Music Director (Ex. E) contained a similar provision. So did the agreement with Professor William Mengelberg (Ex. G); the agreement with Professor Igor Stravinsky (Ex. H); and the agreement with General Director Joseph Keilberth (Ex. I). [Exhibits A, C and F are unavailable, having been lost during the war.]

As to Telefunken and Gramophone, I believe they are not indispensable parties. Their rights can be reserved in the decree to be entered herein. Rule 19(b); Marks Music Corp. v. Jerry Vogel Music Co., 2 Cir., 140 F.2d 268, 270. The judgment to be rendered herein will not under Rule 19(b) "affect the rights or liabilities of absent persons." This in effect was what the old Thirty-Ninth Equity Rule provided. It is discussed at some length in an opinion by Judge Parker of the Fourth Circuit in Oxley v. Sweetland, 94 F.2d 33.

Before the Federal Rules of Civil Procedure went into effect in September 1938, the courts sought to adjudicate cases in the absence of interested parties who could not be brought in. Mr. Justice Sutherland in Bourdieu v. Pacific Western Oil Co., 299

U.S. 65, 57 S.Ct. 51, 53, 81 L.Ed. 42 (decided November 1936) stated the rule in that respect as follows:

"The rule is that if the merits of the cause may be determined without prejudice to the rights of necessary parties, absent and beyond the jurisdiction of the court, it will be done; and a court of equity will strain hard to reach that result. West v. Randall, Fed.Cas. No. 17,424, 2 Mason 181, 196 (opinion by Mr. Justice Story); Cole Silver Mining Co. v. Virginia & G. H. W. Co., Fed.Cas. No. 2,990, 1 Sawy. 685, 689 (opinion by Mr. Justice Field); Story's Equity Pleadings (8th Ed.) §§ 77, 96. And see Russell v. Clark's Executors, 7 Cranch 69, 98, 3 L. Ed. 271; Elmendorf v. Taylor, 10 Wheat. 152, 167, 168, 6 L.Ed. 289. Cf. Equity Rule 39.

"We refer to the rule established by these authorities because it illustrates the diligence with which courts of equity will seek a way to adjudicate the merits of a case in the absence of interested parties that cannot be brought in."

Gramophone has sought the jurisdiction of this Court by instituting a suit (Civil 58–239 [1]) on May 29, 1950, against Mercury, claiming that Mercury has breached its contract with Gramophone in various ways. In that suit Gramophone seeks damages, an accounting, an injunction and other relief. That suit is still pending. If Gramophone wishes to intervene in the present suit brought by Capitol against Mercury, it may do so. But Gramophone's failure to submit itself to the jurisdiction of this Court in the suit brought by Capitol should not be permitted to tie the hands of the Court so that the plaintiff Capitol may not be accorded legal and equitable relief against Mercury for the latter's unfair competition. If Mercury is committing a tort by competing unfairly with Capitol, Gramophone has made Mercury's conduct possible by entering into a contract with Mercury and authorizing Mercury to do the very thing of which Capitol complains. Gramophone not only authorized it, but made the unfair competition possible by supplying Mercury with the matrices from which the phonograph records were made and sold in competition with Capitol.

As stated by Judge Parker in Oxley v. Sweetland, supra [94 F.2d 37]:

"The thing that makes one an indispensable party to a suit is that some interest of his will be affected by it, not that questions of law or fact will be passed upon in which he is interested but by the decision of which he will not be bound."

In Parker Rust-Proof Co. v. Western Union Tel. Co., 2 Cir., 105 F.2d 976, 979, Judge Swan stated:

"The doctrine that one whose interests will be affected by a decree must be made a party to the suit is an equitable doctrine, and a court of equity should not apply it, we think, where special circumstances would make its application inequitable."

In its complaint against Mercury (Civil 58–239) Gramophone alleges:

"Thirty-fifth: On the 23rd day of September, 1949, upon the failure of defendant to cure said breaches and defaults, plaintiff terminated said agreement and demanded that defendant cease to use the said matrices for further production and sale of records and to return same to plaintiff.

"Thirty-sixth: In violation of the terms of the agreement defendant continued and still continues to use said matrices without the consent of the plaintiff for the production and sale of records.

"Thirty-seventh: The plaintiff is entitled to an accounting and to an injunction to restrain the defendant from further use of said matrices for the production and sale of any and all records from the said matrices or from reproductions of said matrices."

Thus Gramophone claims that its contract with Mercury is at an end and seeks an injunction against Mercury's further use

---

1. Suit still pending.

of the matrices in the production of records and Mercury's sale of records made from said matrices. Therefore any injunction that may be issued against Mercury in the suit brought by Capitol will not adversely affect Gramophone's interests. The injunction can be limited to the use of the matrices by Mercury and the sale of any records made therefrom. It need not provide for the destruction of the matrices or the records. Capitol's claim for damages and an accounting is asserted only against Mercury. Thus the relief which might be accorded by the court to Capitol would not affect any interest of Gramophone but in fact would be in accord with the equitable relief Gramophone seeks against Mercury.

■ Indeed, Gramophone and Keynote Records (which includes Mercury) by the supplement to their agreement of November 6, 1947 (Ex. Q) recognized the possibility of litigation arising in this Country if phonograph records were made from Telefunken matrices which Czechoslovakia had confiscated. They agreed that "Keynote accepts it to be solely their own risk and responsibility to trade with the referred to records and keep GWNC free from any liability or detriment". This provision can be interpreted as authorizing Keynote (Mercury) to defend any suit that attacked the right of Mercury to use the matrices which might put in issue the rights of Gramophone under the Czechoslovakia Government's decrees. The 'case of A. L.·Smith Iron Co. v. Dickson, 2 Cir., 141 F.2d 3, would be in point, as showing that under the circumstances Gramophone is not an indispensable party.

Paragraph (k) of the stipulation of facts states:

"(k) Through the years such artists have rendered and recorded their interpretative performances for Telefunken, who engraved such renditions and recordings upon matrices which embody such interpretative performances and which are capable of use and are used in manufacturing phonograph records of such performances."

On January 1, 1941, Telefunken entered into an agreement with Ultraphon [par. (1) of the stipulation of facts]. The agreement (Ex. J) provided that Telefunken granted Ultraphon representation of certain products including "Records of the brand 'Telefunken'."; not including "products of our (Telefunken's) 'special recordings' department". Paragraph 2 of the agreement provided: "As to territory, your representation embraces the protectorate Bohemia and Moravia, as well as, until revoked, Slovakia * * * Exportation of articles subject to representation out of the area of representation is not permitted to you, neither directly nor indirectly".

The representation of Telefunken's interests in the area specified was to be an exclusive one. Paragraph 4 of the agreement provided:—

"You will procure the records enumerated in Par. 1 a. hereof either from us, or will stamp the same yourself from mother matrices or matrices supplied by us. * * *

"You will use the mother matrices or matrices resp. supplied to you only for the purpose of stamping records in accordance with Par. 1 a. hereof. A transfer of these mother matrices or matrices resp. to third persons is not permitted to you. The production of matrices from the mother matrices supplied to you, as well as the stamping from the same and from the matrices supplied to you is to be done by you, and at your cost and at your risk."

The Telefunken-Ultraphon agreement, according to paragraph 15 thereof, was to run from January 1, 1941 until December 31, 1950. It extended itself from time to time for periods of two years. The agreement also provides (par. 16) "In case of the termination of this agreement for whatever reason * * * (d) All mother matrices or matrices resp. of records falling within Par. 1 a. (Telefunken brand records) which are in your possession are to be destroyed within 30 days under the supervision of a trustee appointed by us. The raw material resulting therefrom is at our disposal."

From the above it appears that Ultraphon did not obtain title to the matrices;

that it could not sell or transfer legal title to the matrices to any third person; and that it could manufacture and sell the phonograph records made from the matrices only within the limited territory of Czechoslovakia. If Ultraphon had attempted to permit the matrices to be used in the United States of America by a third party in the manufacture of phonograph records, that would have been a violation of the terms and conditions under which Ultraphon received possession of the matrices from Telefunken.

Paragraph (m) of the stipulation of facts states:

"(m) In 1945 the Government of Czechoslovakia issued confiscation and Nationalization decrees embracing the phonograph record industry under which, and implementing decrees, the property in the possession of Ultraphon including the Telefunken matrices in the custody of Ultraphon were seized and transferred to the Czechoslovakian instrumentality formed for that purpose, namely, Gramophone Works National Corporation, hereinafter called Gramophone, translations whereof are annexed hereto as Exhibits K to P."

The Czechoslovakian decree of October 25, 1945 (No. 108) confiscated without compensation the property of the persons mentioned in Section 7, subdivision 1b, of the Nationalization decree of October 24, 1945 (No. 100). Said Section 7 provided (Ex. K):

"Subd. 1. For nationalized property which at the time of actual termination of enemy occupation and of the Nazi or Fascist regime undoubtedly belonged, or still belongs to persons mentioned below, no compensation is Paid:

"(a) To the German Reich, the Kingdom of Hungary, to public bodies * * *.

"(b) To persons of German or Hungarian nationality, with the exception of those who can prove that they have remained loyal to the Czechoslovak Republic, have never committed offences against the Czech and Slovak nations, and have either actively participated in the fight for the liberation of the Republic or suffered under Nazi or Fascist terror."

Acting under the Decree of October 24, 1945, (No. 100) the Minister of Industry on December 27, 1945, decreed (Ex. L)—in respect to Telefunken's property in Czechoslovakia—

"* * * that the enterprise Telefunken fuer drahtlose Telegraphie G. m.b.H. with the seat in Berlin as to enterprises situated within the boundaries of the Czechoslovak Republic be nationalized on October 27, 1945 by becoming State owned, because it is an enterprise for manufacture of records according to sec. 1, par. 1, No. 27 of the said Decree.

"Through this nationalization, the Czechoslovak State acquires the ownership of the nationalized enterprise to wit: of all real property, buildings and installments serving the operation of the nationalized enterprise, all accessories of the enterprise including all rights (patents, licenses, franchises, trade marks, samples, etc., notes, securities, deposit books cash and outstanding assets belonging to the enterprise, all finished and unfinished goods, semi-manufactures, stocks and materials which belonged to the enterprise on the day when this decree comes into force. Places of deposit of raw material, personal property and rights permanently serving the operation of the enterprise are affected by the nationalization, even if they belong to persons other than the owner of the enterprise."

On December 27, 1945, the Minister issued an Industry edict or decree (No. 925) (Ex. M)—in respect to Ultraphon's property in Czechoslovakia—

"* * * that the enterprise known as 'Ultraphone Stock Company for Gramophone Industry and Trade' with the seat in Prague was nationalized by becoming State owned as of October 27, 1945, because it is an enterprise for the manufacture of gramophone rec-

ords pursuant to sec. 1 subd. 1, No. 27 of the said Decree.

"Through this nationalization, the Czechoslovak State acquires the ownership of the nationalized enterprise to wit: of all real property, buildings and installations serving the operation of the nationalized enterprise, all its accessories, including rights (patents, licenses, franchises, trade marks, samples, etc.), notes, securities, deposit books, cash and outstanding assets belonging to the enterprise, all finished and unfinished goods, semi-manufactures, stocks and materials which belong to the enterprise on the day when this decree comes into force. Places of deposits of raw materials, personal property and rights permanently serving the operation of the enterprise are affected by the nationalization, even if they belong to persons other than the owner of the enterprise."

On March 7, 1946 (see Ex. N) the Minister of Industry together with the Minister of Finance, acting under the Nationalization decree of October 24, 1945 (No. 100) issued an edict or decree (No. 1251) and established the firm of "Gramophone Works, National Enterprise" and transferred to Gramophone various properties, including—

"3. The properties of the enterprise Telefunken Drahtlose Telegraphie G. m.b.H. with the seat in Berlin to the extent of its nationalization.

"4. The properties of the enterprise Ultraphon, akciova spolecnost pro prumysl a obchod gramofony, with the seat in Prague to the extent of its nationalization."

A further decree (Ex. O) was signed by the Minister of Industry on November 27, 1948 (implementing various prior decrees) which formally declared that the enterprise—

"Telefunkenplatte G.m.b.H., Berlin be nationalized, as far as its property and furnishings are located within the Czechoslovak Republic, because it is an enterprise which forms together with the nationalized enterprise an economi-

cal entity and is decisively controlled by the nationalized enterprise pursuant to Subd. 5, of the said Section."

Finally on November 29, 1948, the Minister of Industry, together with the Minister of Finance, decreed (Ex. P) that the property of the nationalized enterprise "Telefunkenplatte G.m.b.H., Berlin to the extent of its nationalization" be embodied into Gramophone Works, National Enterprise, as of January 1, 1946, and that Gramophone take over the obligations of Telefunkenplatte as of January 1, 1946.

From the above decrees it appears that the Czechoslovakian government has confiscated and taken over, has nationalized and embodied in Gramophone, as of January 1, 1946, all of the properties of Telefunken and Ultraphon within the jurisdiction of the Czechoslovakian government. The original decrees of October and December 1945 (Exs. K, L and M) and the implementing decrees of March 1946 and November 1948 (Exs. N and P) were very broad. Within the scope of the decrees were the Telefunken matrices of Mercury involved in this litigation.

The confiscation of the circular metal discs, known as matrices, did not invest the Czechoslovakian government with the right to reproduce records from the matrices and distribute them beyond the Czechoslovakian borders, or to license others situated beyond the Czechoslovakian borders to reproduce records from the said matrices loaned to them for that purpose. The Gramophone Company when it obtained physical possession of the matrices, originally "loaned" to Ultraphon, acquired no more than a property right in the matrices themselves. Of course, Czechoslovakia, as a Sovereign, could through its instrumentality, Gramophone, manufacture records from the matrices in Czechoslovakia and distribute them within its own territory. Its own courts would recognize and enforce that right. But the courts of another nation would not have to recognize any such claimed right because the possession of the matrix did not carry with it the right to the performance, which was with Telefunken in Berlin. The right to reproduce the performances engraved on

the matrices was intangible and its situs was at the domicile of its owner, Telefunken, in Berlin.

An analogy can be found in an early case, Stephens v. Cady, 14 How. 528, 55 U.S. 528, 14 L.Ed. 528, involving the right to a copyright. In that case the Supreme Court distinguished between the tangible property in an engraved copper plate and the intangible right to make and publish the map engraved on the face of the plate. The facts were these: a judgment at law had been recovered against the plaintiff, Stephens, upon which an execution had issued. A copper plate engraving of a map on which plaintiff had acquired a copyright was sold to the defendant Cady pursuant to execution on the judgment. Having become the legal owner of the property in the plate, the defendant Cady claimed the right to print and publish the maps and was so engaged when plaintiff Stephens sued for an injunction barring defendant from pursuing such a practice. The Court characterized the right to print and publish the map as "incorporeal", and declared the plate to be nothing more than the means by which copies of the map were multiplied. It emphatically rejected the proposition that "the right to print and publish the copies adheres to and passes with the means by which they are produced * * *." Shortly thereafter in the related case of Stevens (Stephens) v. Gladding, 17 How. 447, 58 U.S. 447, 15 L.Ed. 155, the court reiterated its holding in the earlier case and concluded that "the incorporeal right (as represented by the copyright) subsists wholly separate from and independent of the plate", and that the sale of the copper plate of the map did not carry with it the right to print maps therefrom. The doctrine of those two cases has been consistently followed.

In Ager v. Murray, 105 U.S. 126, 26 L. Ed. 942, the court held that if equity had jurisdiction of the person owning the intangible right it could deal with the situation and order a transfer of the right, such as a right to a patent. In American Tobacco Co. v. Werckmeister, 207 U.S. 284 at page 299, 28 S.Ct. 72, 77, 52 L.Ed.

208, the court recognized "the separate ownership of the right of copying from that which inheres in the mere physical control of the thing itself". See also, Bobbs-Merrill Co. v. Straus, 210 U.S. 339 at page 347, 28 S.Ct. 722, 52 L.Ed. 1086.

The parties have stipulated:

"(t) Telefunken and Ultraphon Actien Gesellschaft Fur Grammophon Industrie Und Handel of Prague, prior to the issuance of the Nationalization and Confiscation Decrees in 1945, had not terminated their agreement entered into in 1941."

Paragraph (n) of the stipulation of facts states:

"(n) On November 6, 1947 Gramophone entered into two agreements with Keynote Recordings, Inc. and with the defendant making available to the defendant the seized Telefunken matrices for the manufacture and sale of phonograph records therefrom by the defendant in the United States. Copies of said contracts are annexed hereto as Exhibit Q."

The said agreement (Ex. Q) provided:

"3. GWNC shall from time to time upon Keynote's request loan recording matrices specified by Keynote, of which during the period of this agreement will be or have already been produced records by GWNC, the referred to matrices of which have been as property of enemy firms situated on the territory of Czechoslovakia nationalized by decree of the President of the Republic of October 24th, 1945/ collection of laws and regulations No. 100/45/and by the edicts of the minister of industry No. 923 and No. 1251, both published in the official gazette of 1946."

"5. Should any matrices loaned to Keynote become worn, defective or damaged, GWNC shall, if requested by Keynote, replace same and in such event the worn, defective or damaged matrice shall be returned to GWNC by Keynote. If during the period of these agreements Keynote withdraws from its catalogues records pressed

from matrices loaned hereunder Keynote shall return to GWNC the relative matrices. At the termination of this agreement whether by effluxion of time or otherwise Keynote shall return to GWNC all matrices loaned to Keynote and still existing such return to be effected within thirty days of termination."

"12a. Keynote shall sell records pressed from matrices loaned under this agreement under trade marks 'Supraphon', 'Ultraphon' and 'Esta' or under their own trade marks in compliance with the conditions under clause of this agreement; * * *

"d. Keynote hereby acknowledges the validity of the Supraphon, Ultraphon & Esta trade marks and the exclusive ownership of it by GWNC and shall not now or hereafter lay claim to any rights, other than the rights of license, herein granted to the mentioned trade marks."

"20. Keynote shall not assign or license the benefits of this agreement to any person, firm or corporation without the consent in writing of GWNC, but GWNC got advised and have knowledge of the fact, that Mercury Record Inc., 839 South Wabash Avenue, Chicago/ Illinois, USA, are associated with Keynote.

"21. After establishing validity of this contract it should continue for a period of at least two years, i. e. till December 31st 1949 and Keynote shall have the option to renew for a period of other two years on the same terms, by notice given at least 60 days before the expiration of the period of this contract."

Said agreement (Ex. Q) was supplemented on the same day by a further short agreement (part of Ex. Q) which provided:

"With reference to clause 3 of the contract between GWNC and Keynote according to which matrices will be loaned by GWNC to Keynote which fall among the category of nationalized resp. confiscated property of former enemy owners, GWNC indicated the title deeds of their right commercially to utilize these matrices as based on the decree of the President of the Republic No. 100/45 collection of laws and regulations of October 24th, 1945 and the edicts of the Minister of Industry No. 923 and 1251, both published in the official gazette of 1946.

"Keynote on their part undertake and bind themselves to guarantee for the purposes of representation the commercial interest of GWNC, consisting in the production of records from GWNC matrices and the sale of records pressed from such matrices or the sale of imported gramophone records, for all possibly accruing legal sequences and eventualities, particularly the case of litigation by actions for damages, infringement of copyright laws or royalties in USA, supposing that any suiters and claimants to presumptive rights in respect to these matrices should raise claims in USA, may such claims now arise from authors, artists, record-producers or patentholders, which according to Czechoslovak statutes & laws would be void of force and relevancy; Keynote accepts it to be solely their own risk and responsibility to trade with the referred to records and keep GWNC free from any liability or detriment."

Paragraph (s) of the stipulation of facts states that Gramophone terminated its agreement with defendant, including Keynote Recordings, Inc., on August 18, 1949. The present action was instituted by Capitol Records, Inc. by the filing of the complaint in the Clerk's Office on April 1, 1949. On May 29, 1950, Gramophone filed a complaint (Ex. R) in this Court against Mercury claiming about $120,000, seeking also an accounting and an injunction. Mercury answered (Ex. R) the Gramophone suit and pleaded various counterclaims, totalling $433,000 in damages.

The stipulation of facts herein further states in paragraph (o) that—

"(o) On October 1, 1948 the plaintiff entered into an agreement with Telefunken in Berlin under which and upon payments therein specified, plain-

tiff acquired the right to import from Telefunken of Berlin its matrices and to manufacture and sell phonograph records therefrom in the United States and Western Hemisphere containing the artistic interpretative performances recorded and rendered by Telefunken artists. Photostat of said contract is annexed hereto as Exhibit S."

The contract between Capitol Records, Inc. and Telefunkenplatte, G.m.b.H. contains recitals that the companies are respectively engaged directly or through subsidiary corporations in the recording, manufacture and distribution of phonograph records and that "the Companies desire to enter into this contract for the primary purpose of exchanging matrices and making matrices available to each other for their use".

The said agreement (Ex. S) provided that its initial period shall be for five years from October 1, 1948, subject to renewal from year to year upon mutual consent. Paragraph I thereof provides:

"In the event of termination of this agreement, the Companies shall be relieved from any further obligation to exchange matrices hereunder. Within thirty (30) days of the said termination of this agreement, all matrices received hereunder shall be returned to the Company originally supplying the same, or its successor, or, in the alternative, shall be destroyed and all duplicates thereof or matrices made therefrom shall be destroyed. The rights granted hereunder to distribute records, however, shall continue as to all records manufactured pursuant to this agreement prior to such termination date subject to the obligation to make the regular quarterly accountings and payments in connection therewith as herein provided with respect to records manufactured pursuant to this agreement.

\* \* \* \* \* \*

"B. The term 'matrix' as used in this agreement is defined to mean a positive or a negative of an original recording from which records in commercial quantities can be produced, directly or indirectly."

The contract between Telefunken and Capitol also provided:

"V. Each Company grants to the other the right exclusive except as to itself only to process and manufacture records from matrices which it (the former) has or may have available for exchange hereunder in the respective Territories above named, and in said Territories only, and each Company grants to the other the non-exclusive right to distribute records made from matrices which it (the former) has or may have available for exchange hereunder."

"XI. Each Company shall pay to the other the amount of artists' royalties, if any, on all records manufactured or distributed by such Company or any of its subsidiaries from matrices delivered to it by the other, at rates and otherwise in accordance with the respective artist's contract (to the extent that such Company has been notified and informed thereof) with the Company which recorded the matrix. Each Company shall also pay to the other the amount of any other fees and payments which are now or which hereafter may be required with respect to such records by reason of contract of the other Company with a musician's union or by other contracts to the extent that such Company has been notified and informed thereof."

"XIII. Each Company shall account to the other and to the Joint Export-Import Agency on a quarterly basis for all fees, artists' royalties and any and all other sums which may become due and payable from that Company to the other under the terms of this agreement. The said quarterly accounting periods shall end on the last day of March, June, September and December in each year. Within thirty (30) days after the termination of each such accounting period, each Company shall transmit to the other and to the Joint Export-Import Agency a full and detailed accounting for the period just completed. Upon the rendering of such an accounting, the payment thereof

shall be made forthwith in United States dollars in such manner as shall be approved by the Joint Export-Import Agency."

As to trade marks and trade names, the agreement (Ex. S) provided:

"XVI. * * * The German Company hereby gives and grants to the American Company a license, exclusive except as to itself only, to use the insignia, trade name, and trade mark of the German Company in the American Territory on records manufactured by the American Company or on its behalf from matrices supplied to it by the German Company hereunder, to the extent that the German Company has the right to give and grant such a license as to such Territory."

Paragraph XXIV provided:

"XXIV. This agreement is subject to the approval of the Joint Export-Import Agency."

Under paragraph XXVI it was expressly agreed that the validity of the agreement and all matters relating to the interpretation and performance thereof should be determined by the laws of the State of New York.

A list of the thirty-four Telefunken records is set forth on three pages of Exhibit X.

In relation to Exhibit X the parties have stipulated:

"(bb) The statement annexed as Exhibit X, consisting of three pages, enumerates the recordings initially and originally rendered for Telefunken by artists therein named on the respective dates therein shown, of which as therein indicated, plaintiff and defendant are manufacturing and selling phonograph records and of which as therein also indicated, plaintiff has not yet but defendant has already, manufactured and sold phonograph records, and constitutes the basis for proof of damages for each party as of the date of the pretrial conference."

By their stipulation of facts the parties have expressly eliminated from this suit the coypright status of the works recorded [par. (p)]. Neither party claims ownership under copyright law or otherwise of the works recorded on the phonograph records involved [par. (q)]. The validity of and plaintiff's right to use the name, trade name and trade marks of Telefunken are not in issue; and plaintiff concedes that defendant did not use or authorize the use of said name, trade name or trade marks [par. (r)].

Although the parties have stipulated, "that while Germany was governed by the Nazi regime, recordings by non-Aryan artists were prohibited and the sale of records by Aryan artists had to be approved by the Nazi regime", that would not put the recordings made by the Aryan artists in the class of property beyond the protection of the law in this country. As much as we may deplore such intolerant and oppressive practices imposed on a German industry by the edicts of the Nazi Government, our own public policy would not oblige us to disregard all questions relating to the claimed rights of these litigants to use the matrices in the manufacture of phonograph records, or render whatever rights they may have respectively acquired by contract unenforceable. Holzer v. Deutsche Reichsbahn-Gesellschaft, 277 N.Y. 474, 479, 14 N.E.2d 798. Indeed the contract between plaintiff and Telefunken (Ex. S) bears the official stamp of the "Joint Export-Import Agency—Berlin Office (American Sector)" and is stamped "Approved". "An export license will be issued upon receipt of notice that payment has been arranged in accordance with contract terms". We have the right to assume that the Joint Export-Import Agency, in the American Sector of Berlin where the main office of Telefunken has always been located, knew as much about the Nazi non-Aryan proscriptions as we do. Further, it seems to have been the policy of our Government to assist in the re-establishment of the business and industry of Western Germany, and it was to the interest of our Government to do so.

The Joint Export-Import Agency was established by an agreement dated December 2, 1946, between the United Kingdom and the United States in New York, N. Y. 61

U.S.Stat. 2475. It was a formal agreement implementing the offer of the United States Secretary of State to agree to an economic fusion of the American Occupation Zone with the Occupation Zone of any other nation willing to cooperate with the American Military Government in bringing about the economic unity of Germany.

The Agency controlled the foreign trade of those parts of Germany occupied by the United States and the United Kingdom. On the export side, it approved all proposals to export goods from Germany and determined the countries to which exports should go, the prices at which they should be sold, and other conditions relating to export contracts such as the period and place of delivery and the currency of payment.

Applications for permission to export were received from German exporters. When it was decided that the export should be allowed, following advice from the local Land Economic Ministry, and that payment would be made in an appropriate manner, an export license was issued.

By an amendment to the Agreement, dated December 17, 1947, the United States was given a larger say in the Agency, as a result of an increase in our monetary contribution toward the functioning of that Agency. [Monthly Report of the Control Commission for Germany (British Element)—April 1948 p. 18.]

The Export-Import Agency was responsible for organizing the whole of the external trade of the Joint British-American Zone. It was the aim of the two governments that their liability to pay for imports into Germany should cease at the end of 1949 and that after that date the British and American Zones should together form a self-sustaining economy, capable of producing sufficient exports to pay for necessary imports. It was also the aim of both governments eventually to obtain from the proceeds of German exports some of the cost of the occupation of Germany. The development of German exports to this extent was a major undertaking. [Monthly Report of the Control Commission for Germany (British Element)—March 1947.]

The parties have stipulated:

"(y) It is common knowledge and the Court is asked to take judicial notice thereof, that the state of war between the United States and the Government of Germany was terminated by Joint Resolution of the 82d Congress, 1st Session, approved October 19, 1951 (H.J. Res. 289) and that trade between citizens of the United States and subjects of Germany was permitted since on and before March 4, 1947 by the Foreign Funds Control of the Treasury Department by amendment to general license number 94 on said date."

This paragraph should be read with paragraph (g) of the stipulation which states:

"(g) The office and domicile of Telefunken in Berlin was located in the United States Sector when that City was divided into Sectors and the export operations of Telefunken are under the supervision of the Joint Export-Import Agency, Berlin Branch, United States Sector."

The parties have also stipulated [par. (w)] that while Czechoslovakia was overrun by the Nazi regime of Germany, the government in exile of Czechoslovakia declared war on Germany on December 16, 1941; that about April 1945, that government returned to Prague and that our government recognized the government of Czechoslovakia before and after its territory was overrun by the Nazi regime of Germany [par. (x)]. The stipulation also states [par. (v)] that the government of Czechoslovakia has been under the rule of a Communistic regime officially since February 25, 1948. I do not see how those facts as to the various governments of Czechoslovakia have anything to do with the decision of the issues in this case. The Communistic regime now in control of the government of Czechoslovakia has been recognized by the United States, at least to this extent that the two governments maintain diplomatic relations. We may disapprove and abhor many of the things the present government of Czechoslovakia has done and reject communism and all its works, but that has nothing to do with the

344

issues in this case. The manner in which the decrees or edicts were made or issued may not be our idea of enacting legislation, but if that is the way they do those things under their form of government, we give it effect in our courts. Eastern States Petroleum Co., Inc., v. Asiatic Petroleum Corp., D.C.S.D.N.Y.1939, 28 F.Supp. 279; Banco De Espana v. Federal Reserve Bank, D.C.S.D.N.Y.1939, 28 F.Supp. 958, affirmed 2 Cir., 114 F.2d 438, and cases cited therein.

■ An important question presented is this: What rights did the Government of Czechoslovakia acquire under its confiscation decrees? It acquired title to the res, the thing called a matrix. It could control the use of the matrix in the reproduction of records in Czechoslovakia, and derive revenue therefrom and prevent any one from bringing into Czechoslovakia from Germany a duplicate matrix and using it to manufacture records in Czechoslovakia. It could bar the importation into Czechoslovakia of phonograph records made from the matrix in Germany. All this Czechoslovakia could do as a Sovereign, so as to give the matrix it had confiscated a monopoly value within its own territory. It did not have to pay anything for the privilege of doing so either as royalties to the artists who had made the recordings for Telefunken or as payments to Telefunken under the Ultraphon contract.

But once Czechoslovakia through its national agent Gramophone attempted to extend its self-created monopoly beyond its borders and to exercise its right to produce phonograph records from the matrices in foreign countries, it was open to a challenge from either Telefunken or from anyone claiming to exercise ·Telefunken's right to produce phonograph records from a Telefunken matrix. Unless the provisions of a treaty made by Czechoslovakia with Germany or of a treaty to which the United States was a party gave ·Czechoslovakia the right to use the matrix in the United States to manufacture phonograph records, Czechoslovakia could not give itself that right and have ·it recognized in· the courts of the United States.

■ Defendant's attorney argues that since the seizure of German property within the territory of Czechoslovakia was recognized by the United States and the other signatories to the Treaty of Paris on January 24, 1946, Czechoslovakia could use the seized Telefunken matrices to manufacture· records in this country. The Paris treaty contained a provision that:

"Each signatory government shall,. under such procedures as it may choose,. hold or dispose of German enemy assets within its jurisdiction in manner designed to preclude their return to German ownership or control. . * *"

["Agreement on Reparations from ·Germany-etc. U. S. Dept. of State, Treaties and other International Acts, Series No. 1655. Dept. of State Bulletin, Vol. XIV, No. 343, January 27, 1946, at p. 114."]

There were eighteen signatories to the treaty of Paris. The United States of America and Czechoslovakia signed the treaty. An adjunct to the treaty of Paris (an agreement relating to the resolution of conflicting claims to German enemy assets) which is printed in "The Department of State Bulletin" Vol. XVIII, No. 444, Jan. 4, 1948, contains at p. 12, the following article No. 29:

"The assertion of custodian control over a German enemy interest in property within the territory of one party shall not be deemed to have destroyed the German enemy interest in property within the territory of another party."

If we apply this quotation to the facts in this case, the Czechoslovakia seizure of the matrices of Telefunken in Czechoslovakia could not destroy the rights which the Military Control Council had over assets of Telefunken within the sector of Berlin which was under the control of the United States Military. No signatory to the treaty of Paris could assert through certain German enemy assets it may have seized, any additional rights which were part of the German enemy assets within the territory controlled by the Joint Military Control Council. None of those rights were expressly given up by the treaty of Paris and in fact they were impliedly reserved by the later adjunct to the treaty, an agreement:

relating to the resolution of conflicting claims to German enemy assets.

The plaintiff's attorney states that the basic question of law in this case is this—

"May the Government of Czechoslovakia or any government, during peace or war, by law, edict, decree or fiat, affect title beyond its territorial borders to intangible property rights of which the situs is outside its territorial borders?"

He argues that—

"The status of title in Czechoslovakia as a result of the seizure is irrelevant here. The status of title outside of Czechoslovakia of the physical matrices seized is also irrelevant because the possessor is circumscribed in their commercial use by reason of lack of title to the more highly valuable incorporeal interpretative performances engraved upon them which were never vested in Ultraphon and were never located in Czechoslovakia and were not within the power of that government to seize, the situs of these intangible interpretative performances having always been in Berlin, Germany."

The recordings on the matrices represented the performances of the artists. The law of Germany (Ex. V), Czechoslovakia (Ex. W) and New York, as expressed in its decided cases, all recognize artistic performances as property. All rights of the artists were assigned to Telefunken (Exs. A to I inclusive). The artists agreed to make the recordings solely for Telefunken and not for any others. The artists received payments for the recordings and assignment of their rights, including royalties on the retail sales of phonograph records made from the matrices of their recordings. Telefunken for its part recorded the performances of the artists, manufactured the matrices, made the phonograph records therefrom either itself or through licensees accompanied by a loan of the matrices to corporations in other countries. It advertised the work of the artists and in most instances applied the Telefunken trade-mark to the phonograph records. The work of the artists, the rights Telefunken acquired from the artists constituted property rights of Telefunken (something distinct from the metal matrices) a valuable property right, which will be protected from unfair competition by one who misappropriated that property.

In Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483, Id., 279 App.Div. 632, 107 N.Y.S.2d 795, the defendant had pirated and recorded a contracted broadcast and was enjoined because it had taken property rights of commercial value. Metropolitan had given to Columbia Records the exclusive privilege of making and selling records of its performances. A preliminary injunction, restraining the defendants from recording and selling musical performances of plaintiff was granted. In the Metropolitan Opera case Judge Greenberg stated that unfair competition was not limited, as of old, to a "palming off" of goods of the seller as those of another; that the doctrine of unfair competition had been extended to the "granting of relief in cases where there was no fraud on the public, but only a misappropriation for the commercial advantage of one person of a benefit or 'property right' belonging to another." [101 N.Y.S.2d 489.] (See the cases cited therein to support this statement.)

The decision of the United States Court of Appeals, Second Circuit, in RCA Mfg. Co. v. Whiteman, 114 F.2d 86, 88, is not to the contrary. The meat of the decision in the Whiteman case was that "the records themselves could not be clogged with a servitude" which limited the use of the records "for non-commercial use on phonographs in homes". The court held that "Restrictions upon the uses of chattels once absolutely sold are at least prima facie invalid; they must be justified for some exceptional reason, normally they are 'repugnant' to the transfer of title."

In the RCA Mfg. Co. v. Whiteman case the appellate court stated:

"It is only in comparatively recent times that a virtuoso, conductor, actor, lecturer, or preacher could have any interest in the reproduction of his performance. Until the phonographic rec-

ord made possible the preservation and reproduction of sound, all audible renditions were of necessity fugitive and transitory; once uttered they died; the nearest approach to their reproduction was mimicry. Of late, however, the power to reproduce the exact quality and sequence of sounds has become possible, and the right to do so, exceedingly valuable; people easily distinguish, or think they distinguish, the rendition of the same score or the same text by their favorites, and they will pay large sums to hear them. Hence this action. It was settled at least a century ago that the monopoly of the right to·reproduce the compositions of any author—his 'common-law property' in them—was not limited to words; pictures were included. Turner v. Robinson, 10 Ir.Ch. 121; S.C. 10 Ir.Ch. 522; Prince Albert v. Strange, 1 McN. & G. 25. This right has at times been stated as though it extended to all productions demanding 'intellectual' effort; and for the purposes of this case we shall assume that it covers the performances of ·an orchestra conductor, and—what is far more doubtful—the skill and art by which a phonographic record maker makes possible the proper recording of those performances upon a disc. It would follow from this that, if a conductor played over the radio, and if his performance was not an abandonment of his rights, it would be unlawful without his consent to record it as it was received from a receiving set and to use the record."

The last sentence of this quotation is pertinent.

■■■■ In the case at bar we have the physical reproduction in this Country by Gramophone's licensee, Mercury, of the recording on the Telefunken matrix. The matrix was only loaned to Ultraphon to make phonograph records for sale within Czechoslovakia. This case does not involve any servitude on an article made to be sold at retail. No public policy requires the removing of the territorial limitations placed on the use of the matrix. Defendant argues that there is no showing as to how the matrices got into Czechoslovakia. The presumption is that they got there under the provisions of Telefunken's contract with Ultraphon. Any other assumption would be a mere speculation.

■■■ The copying or reproduction of a phonograph record would be unfair competition. RCA Mfg. Co. v. Whiteman, supra. The same principle should be applied as was enforced in respect to the perforated paper rolls, used to reproduce a musical composition mechanically on a piano. Pirating the perforated music roll, made by another, was held to be unfair competition in Aeolian Co. v. Royal Music Roll Co., D.C., 196 F. 926, and an injunction was granted the complainant.

The case of Ricordi & Co. v. Haendler, 2 Cir., 194 F.2d 914, 915, did not establish any principle that could be used to support the proposition that duplicating a phonograph record of· a competitor is not unfair competition. The appellate court (Second Circuit) in the Ricordi case held that the question before it was "one of federal law": i. e. Did the plaintiff preserve any rights after publication in the book except those granted by the copyright? The court held that after plaintiff's copyright had expired the public "might reproduce the book without any limitation" and could reproduce it photographically. The court stated also that "we have great doubt that the court which decided Dutton [& Co.] v. Cupples [117 App.Div. 172, 102 N.Y.S. 309], would have found enough distinctive in the plaintiff's [Ricordi's] typography to sustain a claim of 'unfair competition' based upon photographing it"; and noted that plaintiff's books in the Dutton case were "profusely illustrated with illuminated capitals and type adapted from that used in ancient missals as well as by pictures in colors, some originally prepared by plaintiff's artists and some being copies of well-known paintings." The court in the Ricordi case stated that "It would be a far cry from a book so embellished to the plaintiff's book".

The recording of each artists for Telefunken produced a matrix that in the realm of music was as highly embellished and il-

luminated by the talent of the artist and was as distinctively the creative work of the artist as were the books of Dutton, and is entitled to equal protection against unfair competition. The Ricordi case has no application to the case at bar. The Dutton case supports plaintiff's contentions. There is no claim in this case by either side that the Copyright Law has any application.

Defendant cites several cases which are distinguishable from the case at bar. They did not involve any duplication of a competitor's phonograph records. In Supreme Records, Inc., v. Decca Records Inc., D.C., 90 F.Supp. 904, the litigants had each made a separate recording of the same song and sold phonograph records thereof with the permission of the author. The only similarity was that the same musical composition was recorded. But the recordings were made by different artists. The court denied an injunction.

In Shapiro, Bernstein & Co. v. Miracle Record Co., D.C., 91 F.Supp. 473, the issue was one of the alleged copyright infringement. The court held there was no copyright and no infringement. Duplication of phonograph records of a recording made by an artist was not involved. Monkton v. Gramophone Co., 106 L.T.Rep. 84, and Musical Performers Protection Ass'n v. British International Pictures, Ltd., 46 T.L.Rep. 485, involved the English copyright statutes. However, in the latter case it was held that the making of a phonograph record of a performance without the consent of the performer was illegal. That was also a holding of RCA Mfg. Co. v. Whiteman, supra.

Beecham v. London Gramophone Corp., Sup., 104 N.Y.S.2d 473, held that British Lion Production Assets Ltd., which had made the sound track for the motion picture "Tales of Hoffman", acquired from Sir Thomas Beecham and Anglo-American Music Assoc., under the special provisions of its contract, the right to assign or dispose in whole or in part of the products of Sir Thomas' services; and that the British Lion Productions Assets Ltd. had not acted wrongfully by assigning to London Decca the right to manufacture records from the sound track of the motion picture. No preliminary injunction was granted, even though Beecham and the Royal Philharmonic Orchestra, at the time the recordings were made for the sound track, were under exclusive contract in the United States to make recordings for Columbia Records Inc. The court found that there had been no showing of any wrongful misappropriation of the property right of another, to justify the issuance of a preliminary injunction.

The case of Shostakovich v. 20th Century Fox, 196 Misc. 67, 80 N.Y.S.2d 575, 579, did not involve the issues here presented. The plaintiff artists in the Shostakovich case objected to the use of their music and names in an anti-Soviet film. They were citizens of the Soviet Union. In that case the Doctrine of Moral Right and the New York State Civil Rights Law were urged by plaintiff. The plaintiff's works were in the public domain. Although the court stated that under the Doctrine of Moral Right, it could in a proper case, prevent the use of a composition or work in the public domain in such a manner as would be violative of the author's rights, it found no basis in the facts presented for granting the drastic relief of an injunction, "in the absence of any clear showing of the infliction of a wilful injury or of any invasion of a moral right".

 In a prior part of this opinion I have discussed the question of title to the performances and the right to reproduce the records in America. Plaintiff has that title and right. The dates of production might have some bearing on the question of damages if plaintiff had stood by and done nothing to stop defendant from violating plaintiff's rights. H. A. Metz Laboratories, Inc., v. American Pharmaceutical Co. Inc., D.C.S.D.N.Y.1936, 18 F.Supp. 598, affirmed Winthrop Chemical Co. v. American Pharmaceutical Co., 2 Cir., 94 F.2d 587. But plaintiff was not guilty of laches. The parties have stipulated (par. (d)) that "Plaintiff gave notice of the matters alleged in the complaint before commencing the within action". The action was commenced by the filing of the complaint in the Clerk's Office on April 1, 1949. Defendant, Mer-

cury's earliest release date for any of its records is May 1, 1949, when it released fourteen of the records. On July 1, 1949 Mercury released another record; on August 1, 1949, eight more records; on April 1, 1950 an additional nine; a record on July 1 and one on October 2, 1950. Mercury deliberately disregarded both plaintiff's notice and the filing of the suit and went right ahead producing records from matrices which it had received under its contract with Gramophone. The parties have stipulated (Par. S) that "Gramophone Works National Corporation terminated its agreement with defendant (Mercury) including Keystone Recordings, Inc. on August 18, 1949", perhaps September 23, 1950, is the correct date.

As hereinabove stated, Gramophone on May 29, 1950, brought suit in this court against Mercury for breach of the contract of November 6, 1947 (modified the same date), charging that Mercury failed to account to Gramophone for the total number of records produced and sold by Mercury and failed to pay Gramophone all the royalties due it (alleged to be $21,504.57); that Mercury agreed to purchase certain records manufactured by Gramophone and shipped to Mercury, and that there is $48,192.13 due therefor; that Gramophone shipped Mercury 709 matrices, which were loaned to Mercury at a prescribed rental fee, and that Mercury has refused to return 411 of the matrices, to the damage of Gramophone of $20,000; that Mercury agreed to pay Gramophone a rental fee of $5 or $8 for the matrices (10 and 12 inches respectively), plus packing and transportation charges, and Mercury owes Gramophone $4,770.95 therefor; that Mercury produced long-playing records in addition to regular 10 and 12 inch records in violation of its agreement with Gramophone, and paid no royalties thereon and owes $25,000 therefor; that on August 18, 1949, Gramophone gave Mercury notice of Mercury's breach of the agreement and gave thirty days notice that the agreement would be terminated if the breaches were not remedied; that on September 23, 1949, Gramophone terminated the agreement and demanded that Mercury cease the produc-

tion and sale of the records and return the same to Gramophone, but Mercury has refused. Total damages of $120,467.65 and an injunction are sought by Gramaphone in its suit against Mercury.

Mercury's answer to the Gramophone suit pleaded a number of defenses and counterclaims, seeking damages of $433,925.80. Mercury also seeks an accounting of masters, matrices and finished records sold or used by Gramophone in Czechoslovakia and that Gramophone be enjoined from the exploitation or sale of defendant's (Mercury's) records in Czechoslovakia or any foreign country. The answer was filed June 26, 1950.

■ From the pleadings in the suit of Gramophone against Mercury it appears that large sums are claimed by both sides to that litigation. Only thirty-four of the matrices are involved in this litigation of Capitol against Mercury. Whether or not there are sums claimed by Gramophone on these thirty-four records in its suit for an accounting against Mercury, does not definitely appear. It may very well be, however, in view of the scope of the Gramophone-Mercury litigation, that at least part of what plaintiff Capitol is seeking in this case from Mercury, is also being claimed by Gramophone from Mercury. It indicates that the sums involved are large and that Mercury has not been damaged by any alleged delay on Capitol's part in asserting its rights. Mercury's conduct in respect to the thirty-four records was deliberate and with full knowledge of Capitol's claim of title to the performances of these thirty-four records and Mercury is persisting in its course of conduct. On such a showing a court of equity will direct not only an accounting of Mercury's profits on the thirty-four records involved in this action but will also protect plaintiff Capitol from any continuation of Mercury's illegal conduct by directing that an appropriate injunction be issued.

■ Defendant's attorney argues that defendant is prior in time as to the date of its contract with Gramophone (November 6, 1947) as compared with plaintiff's contract with Telefunken (October 1, 1948),

and also prior in time in producing in America all but a few of the thirty-four records involved in this action. As to twenty-three of the thirty-four records, defendant, up to the date of the stipulation, was the sole producer in America. As to eight of the remaining eleven, the defendant was the first to produce; as to the balance of three the plaintiff had the earlier release date. However, plaintiff was the first to produce any one of the records here involved (Voices of Spring, April 4, 1949). Defendant relased a number of records on May 1, 1949. I do not believe that in this suit the earlier date of contract or the earlier release date has any bearing on the question of title to the performance of the artist or to the right to produce records of those performances in America.

Defendant's attorney further argues that there has been a failure of proof in respect to certain items (eight recordings) which defendant claims were not recorded by Erna Sack for Telefunken during the period covered by her two contracts, October 1, 1934 to September 30, 1936 (Ex. B), and January 1, 1937 to December 31, 1938 (Ex. D). Plaintiff asserts that the contracts for the period during which the eight recordings were made for Telefunken by Erna Sack are lost or presently unavailable. That she made the eight recordings for Telefunken cannot be disputed. It is proper to assume that she made the recordings pursuant to a contract. Secondary proof of the contents of the contract may be submitted at the accounting which will be heard by a special master. The question raised is related to the matter of damages.

Finally, defendant Mercury urges that it is paying royalties to Stravinsky who is now in this country, and that Mercury has an agreement with Stravinsky permitting Mercury to reproduce here the recordings Stravinsky made for Telefunken under his contract with Telefunken. Stravinsky could not give to Mercury any rights which he had already given to Telefunken. At best the Mercury-Stravinsky contract was a move on Mercury's part to ward off any demands of Stravinsky and at the same time give Mercury some source of claim of title to bolster Mercury's claims under its contract with Gramophone. Of all the thirty-four records, Stravinsky's record (The Card Party) which was released by Capitol on September 5, 1949 and by Mercury over a year later (October 2, 1950) was the only Telefunken recording on which Mercury paid any royalty to the artist who made it. Defendant also argues that three of the numbers were recorded in Amsterdam and one in Prague and that they were subject directly to the laws of countries later at war with the Third Reich, and that that may create possible problems of jurisdictional conflict which would tend "to confuse further the confusing claims made herein". There is nothing presented to support that statement. It is based on a surmise, not proof.

A decree will be entered herein in favor of the plaintiff, which will declare:

(1) That plaintiff, Capitol Records, Inc., is alone entitled to manufacture and distribute in the United States of America phonograph records made from the matrices of the thirty-four musical compositions involved in this litigation, said matrices having been made by Telefunken from recordings of the artists named therein, and to the use of the name Telefunken in connection therewith;

(2) That defendant, Mercury Record Corporation, is not entitled to manufacture or distribute any records in the United States of America made from the matrices of the said thirty-four musical compositions which were furnished Mercury by Gramophone Works National Corporation.

And the said decree will provide:

(3) That defendant, Mercury, its agents, officers, directors, managers, salesmen, solicitors, employees and servants be enjoined from using said thirty-four matrices, derivatives and duplicates in the manufacture of phonograph records or otherwise, and from the sale or distribution in any manner of phonograph records produced therefrom, and from the use in any form or manner, or in any medium, the name "Telefunken";

(4) That the defendant Mercury pay the plaintiff Capitol the amount of any dam-

ages sustained by Capitol by reason of Mercury's manufacture and distribution of phonograph records of the thirty-four musical compositions involved in this action;

(5) That the defendant Mercury pay the plaintiff Capitol the profits Mercury has derived from the manufacture and sale of phonograph records of the thirty-four musical compositions involved in this action;

(6) That a special master be appointed to ascertain the amount of plaintiff's said damages and of defendant's said profits;

(7) That plaintiff recover its proper costs and disbursements.

Settle a decree accordingly on five days' notice.