**PRODUCE REPORTER CO. v. FRUIT
PRODUCE RATING AGENCY et al.**

(District Court, N. D. Illinois, E. D.    July 15,
1924.)

No. 1329.

**1. Copyrights ⊂⊃57—Copyright of directory of
produce growers and dealers held infringed
by copying without independent investigation.**

Complainant's copyrighted directory of
produce growers and dealers, with financial rat-
ings, *held*, on the evidence, to have been in-
fringed by defendants by copying and using in a
competing publication information contained
therein, without independent investigation.

**2. Copyrights ⊂⊃56—Rule stated as to extent
to which use may be made of another's copy-
righted book.**

The use of another's copyrighted book
merely for the purpose of comparison and
checking, without copying, does not constitute
infringement; but, if verification is colorable
and information finally published is based on
what is copied, rather than on what is dis-
covered by verification, there is infringement.

**3. Copyrights ⊂⊃83—Common errors in two
publications are persuasive evidence of copy-
ing.**

Common errors in two publications are the
most persuasive evidence of copying and of
lack of thorough independent investigation.

**4. Copyrights ⊂⊃50—Fraudulent purchaser of
copyrighted publication is bound by restric-
tions on its use.**

One who, through an agent, obtains the
copyrighted publications of a competitor by
false representations, is bound by the restric-
tions imposed on the agent as to their use,
though, if a bona fide purchaser, he would not
be bound by them.

**5. Trade-marks and trade-names and unfair
competition ⊂⊃68—Use of material from
competing copyrighted publication and mis-
leading advertisements held to constitute un-
fair competition.**

Acts of defendants in using material, ob-
tained from complainant's copyrighted publica-
tions, through false representations, in a com-
peting publication and in publishing misleading
advertisements, *held* to constitute unfair com-
petition.

**6. Injunction ⊂⊃223(1)—Defendants held in
contempt for violation of injunction against
infringement of copyright and unfair compe-
tition.**

Defendants *held* in contempt for violation of
an injunction against infringement of copyright
and unfair competition.

In Equity. Suit by the Produce Reporter
Company against the Fruit Produce Rating
Agency and others. On supplemental bill.
Decree for complainant.

Edward A. Zimmerman, Stewart Reed
Brown, and Zane, Morse & Norman, all of
Chicago, Ill. (John M. Zane, of Chicago,
Ill., of counsel), for plaintiff.

LINDLEY, District Judge. The plaintiff
corporation is organized under the laws of
South Dakota, and compiles information as
to produce handled by, and financial stand-
ings, ratings, and business methods of, grow-
ers, shippers, and receivers of, and as to
brokers, commission merchants, and other
dealers in, produce. Since 1905 it has pub-
lished and copyrighted annually a credit
reference and rating book, called the Blue
Book, at a cost of at least $500,000. The
defendant corporation is organized under
the laws of Illinois, and its activities are
similar to those of the plaintiff, except that
it restricts its activities to certain lines of
produce. It was organized in 1919 by cer-
tain of the individuals defendant formerly
in the employ of plaintiff, and during that
season prepared a credit rating book called
the Guide Book. Before this book had been
circulated, plaintiff filed a bill charging that
the defendants had received, copied, and used
the confidential information of plaintiff in
compiling their credit book, thereby in-
fringing plaintiff's copyright and committing
unfair competition. The bill prayed for an
injunction.

Final decree in that case in favor of plain-
tiff was entered January 27, 1920, with find-
ings that the names taken from plaintiff's
book were so intermingled with the informa-
tion obtained from original sources that it
was impossible to segregate the good from
the bad, except as to certain general informa-
tion of interest to the trade not affecting the
names or ratings. The court ordered, there-
fore, that all of the Guide Books then pre-
pared should be destroyed by the marshal,
except one, which should be left in charge
of the clerk, and except parts of two others,
which parts, containing the general informa-
tion above stated, were ordered allowed to be
used by the defendants. The decree enjoined
the defendants from publishing or circulat-
ing the Guide Book printed by them, except
that portion thereof which contained the
general information stated and an abstract
of rules and laws relating to the trade, and
that portion known as the atlas, and from
using or making available any information
taken from plaintiff's book, files, and papers
in compiling or publishing any similar books.
The decree was in effect a condemnation of
all of defendants' book, except as to certain
portions aforementioned. All printer's copy,
galley page proof, printer's proof, files, and
papers in the possession of defendants, con-
taining facts acquired from plaintiff's book,
were ordered surrendered to the marshal and
by him to be destroyed.

On April 16, 1922, the plaintiff filed a
supplemental bill of complaint herein, charg-
ing that the defendants, in defiance of the
decree, had not delivered to the United States
marshal all of the materials ordered sur-

rendered; that they had advertised that they would, and in fact did, reprint, with only slight colorable changes, the material ordered destroyed; that the defendants had, since the entering of the decree, published and circulated rating books based upon the confidential information obtained from the plaintiff; that they had from time to time continued by secret means to obtain the confidential information belonging to plaintiff; and that defendants had in various manners been guilty of unfair competition. A discovery was prayed, and temporary injunction petitioned for and granted. Plaintiff prayed a permanent injunction, and that defendants be required to surrender and deliver for destruction all copies of its Guide Book, Green Book, and Junior Guide Book, containing said alleged confidential information of plaintiff, and that the defendants be required to account to plaintiff for their profits made or received from the books so issued.

After answer had been filed, denying the allegations of the supplemental bill, a reference to the master in chancery was ordered on May 4, 1922. He filed his report on July 21, 1922, finding the equities to be with the defendants, and recommending that the bill be dismissed for want of equity. Plaintiff filed exceptions to this report, and while these were pending an application was made by plaintiff, supported by affidavits, to reopen the case and to re-refer the same to the master, to take newly discovered evidence. The order prayed for was entered November 27, 1923, and a re-reference to the master ordered. On May 2, 1924, the master filed his report on said re-reference, recommending that the court find for the plaintiff. Defendants except to said report. Though the issues referred to the master were restricted, the parties have submitted all issues raised by the pleadings to the court for decision upon the evidence reported in the two reports of the master.

In December, 1919, after the court had indicated its decision upon the original bill, but before the entry of the decree, defendants began to prepare the publication of their 1920 book, which was completed in the latter part of July, 1920. Later in the year 1920 defendants began to prepare their 1921 Guide Book, which was completed in April, 1921. In 1921 defendants began the preparation of their 1922 book, and this book was in preparation when the plaintiff filed its supplemental bill, alleging that the defendants had failed to comply with the terms of

the decree and had violated the injunctional part thereof.

After the original decree was entered, one of the counsel for plaintiff and one of the counsel for defendants inspected the three copies of defendants' Guide Book not destroyed. They selected and turned over to defendants the portion of the books containing information to which defendants were entitled, as found in the decree. On the reverse side of the sheets turned over to the defendants were the names and ratings of dealers condemned by the decree. Through them red pencil lines were drawn, though the marks did not obliterate the names and information. This information was available to the defendants, if they saw fit to make use of it.

In the spring of 1921 the defendants Emory, Keillor, and Coyner, by surreptitious methods, through one Teator, obtained the plaintiff's Blue Book for the year 1921, and weekly credit sheets and quarterly supplements of plaintiff. Teator, adequately described by the term "stool pigeon," agreed that he would neither ask for information for the use of other parties nor permit such information to be given other parties, and that the credit book and supplies were only loaned to him, and were to be kept and used in his place of business. In violation of this agreement, he delivered to the said defendants the book and the weekly credit sheets and quarterly bulletins as he received them. The primary purpose in obtaining this book was to compare it with defendants' book, to say the least, and make a list of names and towns therein that defendants did not have, and to print the same in defendants' next book, if they should be approved. Names were copied from the 1921 Blue Book, each being written on a separate slip of paper. Taking the evidence most favorable to defendants, some 320 slips contained the name of the town and state, and on approximately 1,000 slips were the names of dealers and their addresses, taken from plaintiff's book, where plaintiff had listed such dealers and defendant had not. Some of these were investigated independently, and many of them were reprinted in defendants' 1922 Guide Book. The number, according to defendants' witnesses, included some 450 dealers in 128 towns. The evidence of plaintiff is convincing to the court that the copying was greatly in excess of that stated by defendants' witnesses. The court believes that the greater portion of defendants' book has been wrongfully obtained and copied.

It is claimed that, after obtaining the names and addresses from plaintiff's book, defendants conducted an independent investigation of the same before reprinting. Slips containing information from the weekly credit sheets and quarterly supplements were likewise made, and some of these names were reprinted in defendants' book. One of the defendants testified that the names taken from plaintiff's book were from 4,000 to 6,000 in number. Defendant Emory took the Blue Book to his home, and his wife, under his direction, took therefrom a list of towns that defendants' book did not contain. Separate sheets were made for each town. Names were then sent out, and, if defendants thought wise, they then printed the towns in defendants' 1922 book. The number of towns so taken and published in defendants' book was between 1,500 and 2,000. Emory went over the weekly bulletin, and made notes of names that seemed to be new and other items of interest, and turned over such information to Keillor. Certain names in the galley proof were cut out for the reason that they were marked in plaintiff's quarterly as out of business. Defendant Emory testified that the names and towns on Exhibit C, I, and XX, mentioned in the original decree, had been copied from plaintiff's 1919 Blue Book, instead of from original sources, as defendants had originally claimed.

After the decree, defendants had in their files certain cards which bore the names of dealers typed on them from the list copied from plaintiff's 1919 book, together with the code numerals. Certain of these original cards were removed, and copies thereof substituted. Some of these were marked up with finger marks and roughened to look old. From the time when, in December, 1919, the court announced what its decree would be, until January 27, 1920, all of the material ordered impounded was in defendants' possession, available for their use.

It is clear the Blue Book obtained through Teator was used by the defendants, at least by Emory and Keillor, to compile their 1922 Guide Book in its final form, and to save the cost and work of obtaining the information from the original sources. It seems clear that the defendants did not, after first having made a fair and reasonable effort to compile from original sources, compare plaintiff's Blue Book with their Guide Book rating and printing and publication, with a view to securing names, but that they checked plaintiff's 1921 book against defendants'

1921 book, already printed and published, to get the names of dealers and towns that defendants had omitted from that book to use in compiling their next book which was then in the early stages of preparation. For this purpose they copied from plaintiff's book certain material and that material copied was multiplied in the reprinting thereof in defendants' books. Defendants had possession of all of this information from August, 1921, until July, 1922, including the time of the hearing before the master on the first reference. Much of it was kept at places other than defendants' office. The defendants, in their advertisements for their 1921 Guide Book, which was to compete with plaintiff's Blue Book for that year, said that their Guide Book contained a large number of additional towns and dealers; among these were such of those taken from plaintiff's 1921 Blue Book as were republished by defendants. By their use of plaintiff's 1921 Blue Book defendants availed themselves of plaintiff's selective work as to the towns plaintiff published, benefited by plaintiff's work, saved money and work thereby, and republished towns and names first published by plaintiff.

In the interim between the time when Judge Carpenter stated what his decree would be, in December, 1919, and February 24, 1920, when the material ordered destroyed was delivered to the marshal, the defendants not only had the material in their possession, but for some reason largely increased their office force, maintaining an average of from 20 to 25 employees. The defendants' Junior Guide Book was republished by defendants immediately after the decree.

The evidence supporting the statements of fact above was largely circumstantial. One of the strongest circumstances as to the copying from plaintiff's book is that of the common errors in both books, of which there are very many. One is that of the name of Reinheardt, which should have been Peinheardt; another, the name Larson, which should have been Lawson; another, Young & Co., which should have been Germany Roy Brown & Co., a change having been made in 1918. There were many others of similar character. Many of these facts were denied by the defendants, but, in the opinion of the court, the circumstances appearing in this record are sufficient to support the conclusions above set forth, and to overcome the general denials of certain individual defendants. The master so believed, and the

court finds, upon a careful examination of the evidence, that the master's belief was well founded.

The conclusion is inevitable that the defendants wrongfully took from plaintiff's 1921 Blue Book a large number of towns and names and other information, and substantially copied the same in bringing up their 1922 and subsequent Guide Books. The defendants also obtained information from other sources, but the information obtained from plaintiff's book and from the material condemned in the former decree and that obtained from other sources is so intermingled in defendants' Guide Book that the respective portions cannot be segregated.

The defendants claim that what they did subsequent to the decree was done by advice of counsel, but their testimony indicates that counsel did not go so far as to advise them that they might do what they did do; in other words, they went much beyond the advice of their counsel, as to whom the court finds no basis for criticism.

[1] It would seem that there is no great difficulty about the law; the only difficulty arises in applying it to the facts before the court. From the copying of names and towns from plaintiff's book and from the material condemned in the former decree, the printing of the same in defendants' book, after a so-called verification, the presence of common errors in the two books, the use of code numerals, the surreptitious method of obtaining plaintiff's book, the presence of inhibited material, the increase of defendant's office force between the time when the decree was indicated and when it was entered, and the many other circumstances appearing upon a careful examination of the record, the court is convinced that the defendants have copied into their books the fruits and benefits of plaintiff's money and labor. The compilations of plaintiff have been placed in defendants' books. Copies have thus been multiplied. In the opinion of the court this state of facts will submit of no other result than a finding of infringement.

One of the leading cases in this connection is that of Sampson & Murdock Co. v. Seaver-Radford Co., 140 Fed. 539, 72 C. C. A. 55. There the complainant published a general directory of the city of Boston in July, 1903, purporting to give facts as they existed in the spring of that year, which was duly copyrighted. In February, 1904, the defendant published a general directory of the city, which purported to give the facts as they existed just prior to that time. After completing its original canvas for names, defendant copied on slips from complainant's directory such names there printed as it had not obtained in its own canvas. With the information given about them, and with such slips as a guide, it verified them by sending canvassers to the addresses given there, and, when found correct, reprinted the same without alteration in its own directory. The court held that such republication was an infringement of complainant's copyright.

The defendants contend, however, that this case is in direct conflict with the case of Hartford Printing Co. v. Hartford Directory Co. (C. C.) 146 Fed. 332, decided by the Circuit Court for the District of Connecticut. But it is evident that the facts in the case at bar are much more like those of the first-mentioned case than those in Hartford Printing Co. v. Hartford Directory Company. That the Circuit Court of Appeals for the Second Circuit did not mean to disagree with the First Circuit upon the law is apparent from an examination of the later case of Jeweler's Circular Publishing Co. v. Keystone Publishing Co., 281 Fed. 83, 89, where the Circuit Court of Appeals for the Second Circuit discusses the case of Sampson & Murdock v. Seaver-Radford, and in a discursive opinion by Judge Rogers expressly approved the doctrine thereof. The English cases, as well as those of this country, affirming this same doctrine, are multitudinous. Amongst them are West Publishing Co. v. Edward Thompson Co., 176 Fed. 833, 100 C. C. A. 303; Farmer v. Elstner (C. C.) 33 Fed. 494; International News Service v. Associated Press, 248 U. S. 215, 244, 39 Sup. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293.

[2] If one uses another's compilation directly, without any verification, he is, of course, guilty of the pure, unadulterated, labor-saving device of copying. If one uses another's book, merely for the process of comparison and checking, without copying, no wrong is done. The extent of the comparison and the verification becomes material. Honest, thorough, efficient verification, by personal search, and the use of names based upon such verification, and upon ratings so made, might prevent violation of plaintiff's rights; but if the verification is colorable, if the rating as finally made is based upon what is copied, rather than upon what is discovered by verification, as the court believes to be the fact here, there has been an infringement.

[3] Common errors in the two books are the most persuasive evidence of lack of thorough investigation. Such errors can be

accounted for in only one manner. They can occur only when the one who is comparing the alleged information copies a greater or less amount, as the case may be, of the original material. The testimony of witnesses that the work was original, that by comparing they found discrepancies, and that thereafter they verified the information obtained, and made ratings from original sources, becomes of very doubtful credence, in view of the presence of the common errors found in the two publications and the other circumstances in the record.

The defendants contend that this case is controlled by Dun v. Lumbermen's Credit Association, 144 Fed. 83, 75 C. C. A. 241, decided by the Circuit Court of Appeals for the Seventh Circuit; but, as Judge Baker said in that case, "The question is one of fact, to be solved by a study of the evidence," and an examination of the evidence shows a clear distinction between the two cases. In the Dun Case the defendant proved absolute verification and a gain of additional information from original sources to such an extent as to give six times as many different classes of information as was given in Dun's directory. Furthermore, the court did find there some infringement, but held that the same was so insignificant in proportion as not to require the plaintiff to be left to his remedy at law. In the present case the court is of the opinion that the groundwork of defendants' work is the infringed material from plaintiff's book and the inhibited material included in defendants' books and records at the time the prior decree was entered. The infringement is not insignificant, but is of most significant proportions.

[4] Nor can the contention of defendants that the contract made by the plaintiff with Teator, restricting the use of its book, is of no effect against the defendants, be sustained. The book was obtained by Teator by false representations for the benefit of defendants, Teator acting as their agent. The defendants, being principals, and knowingly taking advantage of their agent's fraud, are bound by his actions. The violation of the restrictions by the first recipient of the copyrighted material, at least where the same amounts to a general plan to use essential and material portions thereof for publication, is an infringement. Ladd v. Oxnard (C. C.) 75 Fed. 705; Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 28 Sup. Ct. 722, 52 L. Ed. 1086; 13 Corpus Juris, 1133.

True it is that a bona fide purchaser from the first taker is not bound by the restriction. But defendants, in the present case, are not bona fide purchasers; they are the original recipients, who have wrongfully obtained the plaintiff's book, and who, after thus obtaining the book, have in violation of the plaintiff's rights republished the material contained therein. The actions of the defendants in this connection are most significant in determining the intent with which they acted and produce grave doubt as to whether in fact any reinvestigation of the material copied from plaintiff's book, other than a merely colorable one, was ever made.

[5] The wrongful method of obtaining plaintiff's book, the advertisements of the defendants, containing misrepresentations warranted to deceive and wrongfully to influence probable purchasers, the general scheme of defendants' operations, including the use of memory lists, and the other facts and circumstances occurring in the record, are such, in the court's opinion, as to warrant a finding that defendants are guilty of unfair competition, as well as infringement of copyright.

The master in his final report has properly stated that his first report should be modified in accordance with his later one. The later report is approved, and the exceptions thereto overruled, except as otherwise indicated herein, and a decree will be entered, including findings consistent with this opinion, granting to the plaintiff an injunction of the same character as that granted in the original decree, enjoining the defendants from copying from or using plaintiff's credit books or material in any manner in contravention of the conclusions of this opinion. The defendants will be enjoined from using their book condemned in the prior decree and the subsequent publications thereof, excepting, however, such part of the contents thereof as is not embraced within the court's opinion as improper, and all material by said decree inhibited. The injunction will run against the use of plaintiff's book of 1919, and of all subsequent copyrighted editions thereof.

[6] The court has spoken of the defendants, generally. As it interprets this record, the decree should not run against Sinclair, Ditchburne, and Buckley, as they do not appear to be connected with the actions of defendants now complained of. The decree will run against all other defendants, and appropriate findings will be included, finding all other defendants guilty of a violation of the terms of the former decree, and adjudging them in contempt of court. Punishment for such contempt shall be hereafter fixed by the court, and the cause shall be referred to a master for an accounting.

All condemned and inhibited material now in the possession of defendants, including its books, files, and material used in the preparation thereof, except that which is indicated as proper, shall be delivered to the marshal forthwith. In case an appeal shall be prayed and allowed, and proper bond filed, the material delivered to the marshal shall be impounded by him, in accordance with the motion for an impounding order heretofore filed, and by him retained, pending the appeal. In the absence of the perfection of such appeal, or in case of an affirmance of the decree of this court, all said material shall be destroyed without delay.

A decree in accordance herewith shall be submitted.