**DUCHESS MUSIC CORPORATION et al., Petitioners-Appellants,**

v.

**Martin STERN et al., Respondents-Appellees.**

**No. 71–1854.**

United States Court of Appeals, Ninth Circuit.

March 13, 1972.

Rehearing Denied April 26, 1972.

1306

Robert C. Osterberg (argued), John S. Clark, of Abeles & Clark, New York City, Pasquale R. Cheche, of Meadow, Cheche, Thrasher & Zalut, Phoenix, Ariz., for petitioners-appellants.

B. Allen Millstone (argued), Hollywood, Cal., William C. Loftus, Phoenix, Ariz., for respondents-appellees.

Before KILKENNY and CHOY, Circuit Judges, and BYRNE,* Senior District Judge.

CHOY, Circuit Judge:

This interlocutory appeal requires construction of the remedial and compulsory license provisions of the Copyright Act of 1909, 17 U.S.C. §§ 1(e) and 101(c), (d) and (e). Appellants are a group of music companies which own the copyrights to musical compositions by such diverse and well-known musicians as Elvis Presley, Johnny Cash,

---

* The Honorable William M. Byrne, Senior United States District Judge, Central District of California, sitting by designation.

Burt Bacharach, Mick Jagger, Joni Mitchell, and Buck Owens. They allege that appellee Pearl Rosner and others are music pirates who make cassette tape recordings of phonograph records legitimately issued by appellants from copyrighted compositions. After a nationwide search, appellants discovered a major pirate haven in Phoenix, Arizona. With the aid of private investigators and the local police, they obtained sufficient information to secure from the District Court an *ex parte* order to show cause, a temporary restraining order and a writ of seizure, all directed against the alleged pirates.

The writ of seizure, issued pursuant to 17 U.S.C. § 101(c) and the Rules of Practice issued by the Supreme Court,[1] directed the marshal to seize

" . . . any and all parts of instruments serving to reproduce mechanically plaintiffs' copyrighted musical works and all means for making the same, comprehending labels, cartridges, tape recordings and machinery utilized in the manufacturing process, including Livingston recording machine —side winder, Jagerberg-Werke AG brand tape machines, Weldotron brand equipment, GRT tape winders and Craig testing tape players . . . "

The marshal seized and impounded 25,000 complete tape recordings and master recordings, which serve to reproduce mechanically appellants' copyrighted musical compositions; blank tapes and cartridges designed for use in the manufacture of tape recordings; printed labels; machinery used to transfer the sounds onto blank tapes; packaging and promotional materials; and other equipment and machinery utilized in the manufacturing process. Appellants filed the requisite bond.

Only appellee Rosner, who does business as National Manufacturing Company, appeared and contested the seizure order. She objected to the order's scope on the ground that the statutory authority for seizure and the Supreme Court

rules implementing that authority contemplate the seizure and impoundment only of items of " . . . such nature that they would be the last item of identifiable character used to make an infringing copy." She also contended that since she had filed a statutory Notice of Intention to Use under 17 U.S.C. § 101(e), after the writ of seizure was issued and executed but before the hearing on the preliminary injunction, injunctive relief prohibiting her from using appellants' copyrighted works was unavailable.

The District Court agreed with Rosner on each count. It ordered the return of all " . . . tape recording equipment and machinery, as well as . . . all blank tapes, cartridges, cassettes, labels or any unmarked or unprinted packaging materials. On the other hand, all property which either embodies a mechanical and/or electronic impression of plaintiff publishers' copyrighted works or any packaging or promotional devices identifying or referring to same are still subject to impoundment." The District Court also held that Rosner could avail herself of the compulsory license scheme although she had previously illegally infringed appellants' copyrights and although she intended to continue duplicating the copyrighted material.

The District Court later amended its order, *nunc pro tunc*, to allow an appeal under 28 U.S.C. § 1292(b). The court also stayed its order pending the outcome of this appeal. The seized materials have not been returned to Rosner. We reverse the District Court on both counts and remand.

I

The scope of the seizure order

The Copyright Act of 1909 provides for injunctive and monetary relief for infringement, and also for impoundment and destruction of infringing articles.

1. 214 U.S. 533 (1909), as amended by 307 U.S. 652 (1939). See 17 U.S.C. pp. 276–281.

"If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable:

.    .    .    .    .    .

"(c) To deliver up on oath, to be impounded during the pendency of the action, upon such terms and conditions as the court may prescribe, *all articles alleged to infringe a copyright*;

"(d) To deliver up on oath for destruction *all the infringing copies or devices, as well as all plates, molds, matrices, or other means for making* such infringing copies as the court may order." 17 U.S.C. § 101(c) and (d) (emphasis supplied).

The language used throughout the Supreme Court rules which implement these provisions is not uniform,[2] and there is some verbal confusion about what is to be seized and destroyed. But the statutory mandate is clear. "All articles alleged to infringe the copyright" are to be impounded, and "all infringing copies . . ." are to be destroyed. Neither the statute nor the Supreme Court rules give the District Court any discretion to determine what to impound or what to destroy. The process Congress granted the aggrieved copyright proprietor is a summary one. Universal Film Manufacturing Co. v. Copperman, 206 F. 69, 70 (S.D.N.Y.1913). It is to impound *everything* the plaintiff alleges infringes his copyright. Rules 9 and 10 then provide that the defendant may apply to the court for return of the seized articles if he shows that "the articles seized are not infringing copies, records, plates, molds, matrices, or other means for making the copies alleged to infringe the copyright." Rule 9. The court, in its discretion, may order a return, but only if the defendant has met his burden of proof. Rule 10. If the articles seized are infringing copies or infringing means, the District Court has no discretion to return them. A similar interpretation is applicable to the destruction provision.

■■ There is no reason here to apply the statutory construction rule of *ejusdem generis*[3] to narrow the items to be impounded and destroyed to the general class of plates, molds, and matrices, that is, to items embodying an identifiable impression of the copyrighted work. The statute and Supreme Court rules provide for the impoundment and destruction of three classes of items: (1) infringing copies; (2) plates, molds, matrices, etc.; and (3) other means for making the allegedly infringing copies. If *ejusdem generis* is applicable here, it is applicable to construe the word "etc.," not the words "other means for making such infringing copies." Machines, blank cassettes and cartridges, blank and printed labels, and other devices are "other means" for making infringing copies to appellants' copyrights. They fall within the scope of both the statute and the rules and were properly impounded.

In dealing with copyright infringers, Congress did not halt at injunctive and monetary relief. It prescribed impound-

---

2. Rules 2 and 3 refer to ". . . infringing copies, records, plates, molds, matrices, etc., or other means for making the copies alleged to infringe the copyright . . ." Rule 2. Rule 9 and Rule 3, in a second sentence, omit the "etc." Rules 6 and 11 refer to "infringing articles" and "the articles seized."

3. *"Ejusdem generis*, of the same kind, class or nature. In the construction of laws, wills and other instruments, the 'ejusdem generis rule' is that where general words follow an enumeration of person or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." Black's Law Dictionary (4th ed. 1968) However, *ejusdem generis* is not to be applied to render general words meaningless, United State v. Alpers, 338 U.S. 680, 682, 70 S. Ct. 352, 94 L.Ed. 457 (1950), or to thwart Congress' intent, United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 85 L. Ed. 598 (1941).

ment and destruction. While the Joint Committee reporting the proposed Act did not elaborate on these remedies,[4] they were often discussed in extensive hearings before the Joint Senate and House Committee, held in June and December, 1906, and March, 1908. Congressmen, supporters, and opponents of the copyright bill agreed that the impoundment and destruction provisions were sweeping in their scope, and encompassed machines and items which could be used for other, allegedly innocent purposes. During the June, 1906 hearings, opponents of the bill foresaw the spectre of the destruction of equipment, machines, and entire plants. Hearings on S. 6330 and H.R. 19853 before the Senate and House Committees on Patents, conjointly, 59th Cong., 1st Sess., 124, 177–178, 200 (June, 1906). Proponents of the bill envisioned the same.[5] Congress intended to impound and destroy "the whole of the paraphernalia," including those items which may be used for other purposes.[6]

We, therefore, reverse the District Court's order on this point, and direct that all material and machinery seized continue to be impounded pending a hearing on the merits.

## II
### The compulsory license provision

The congressional committees which drafted the 1909 Act were conscious of the "advance ground" they were taking in "securing the right of composers in the matter of the reproduction by mechanical means of their music." [7] H.R. Rep. 5 (1909). However, they were also acutely aware of the possibility of the creation of a vast "music monopoly" if copyright holders had the exclusive right to determine who was to reproduce their works. Therefore,

"The only way to effect both purposes, as it seemed to the committee, was, after giving the composer the exclusive right to prohibit the use of his music by the mechanical reproducers, to provide that if he used or permitted the use of his music for such purposes, then, upon the payment of a reasonable royalty, all who desired might reproduce the music." H.R. Rep. 6 (1909).

Against this background, Congress enacted § 1(e) of the Copyright Act, 17 U.S.C. § 1 et seq., which reads in relevant part,

"And as a condition of extending the copyright control to such mechanical

---

4. The Committee commented only that "some legislation of this kind is necessary." H.R.Rep. No. 2222, 60th Cong., 2d Sess., 7 (1909). All future references to this Report will be to H.R.Rep. (1909).

5. See Hearing on S. 6330 and H.R. 19853 before the Senate and House Committees on Patents, conjointly, 59th Cong., 1st Sess., 146 (December, 1906).

6. See, in the December hearings, *supra*, n. 8, pp. 179–180, and in the Hearings on S. 2499 before the Senate and House Committees on Patents, conjointly, 60th Congress, 1st Sess., (March, 1908), pp. 37, 123, and 139.
   This was not the judicial practice before the Copyright Act, e. g., Morrison v. Pettibone, 87 F. 330 (N.D. Ill. 1897). However, the 1909 statute was a thorough revision of American copyright law, and the legislative hearings demonstrate that Congress was cognizant of the innocent use problem.

7. While the Copyright Act was intended in some way to overrule White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908), Note, "Sound Recordings, Records, and Copyright: Aftermath of *Sears* and *Compco*," 33 Albany L.Rev. 371, 372 (1969), it did not permit phonograph records to be copyrighted. Capitol Records, Inc. v. Mercury Record Corp., 109 F.Supp. 330 (S.D.N.Y. 1952) aff'd 221 F.2d 657 (2d Cir. 1955). However, if the underlying work is copyrighted, there may be an infringement of that copyright by duplicating the record. Shapiro, Bernstein & Co. v. Goody, 248 F. 2d 260 (2d Cir. 1957). The Congress has at last remedied this anomaly by creating an exclusive right in the copyright holder "[t]o reproduce and distribute to the public . . . reproductions of the copyrighted work if it be a sound recording . . ." S. 646, 92nd Cong., 1st Sess., enacted October 15, 1971. This new right is not retroactive.

reproductions, that whenever the owner of a musical copyright has used or permitted or * * * knowingly acquiesced in the use of the copyrighted work, any other person may make similar use of the copyrighted work, upon payment to the copyright proprietory of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof . . . ."

Section 1(e) is implemented by § 101(e), which reads in part,

Provided also, That whenever any person, in the absence of a license agreement, intends to use a copyrighted musical composition . . . relying upon the compulsory license provision of this title, he shall serve notice of such intention . . . upon the copyright proprietor . . . ."

Rosner invoked these provisions of the Act when she filed a notice of intention to use, declaring her intention to continue the manufacture of tapes by the same duplicating methods used in the past. While appellants argued that the compulsory license provisions were inapplicable to a pirate and that, in any event, the notice was filed too late, the District Court, noting the "gaping loopholes in the Act," agreed with Rosner. We do not.

■ The statute provides that anyone who properly invokes the license provision "may make *similar use* of the copyrighted work." (emphasis supplied.) Rosner admits that she duplicates appellants' copyrighted compositions. She does not make "similar use" of them, she makes exact and identical copies of them. This is clearly outside the scope of the compulsory license scheme.[8]

In Aeolian Co. v. Royal Music Roll Co., 196 F. 926 (W.D.N.Y.1912), a piano roll manufacturer having a license to use

certain copyrighted musical compositions on its perforated rolls sought an injunction against a competitor who was duplicating the rolls. In granting the injunction, the court said,

"The provision of the statute (section 1e) that 'any other person may make similar use of the copyrighted work' becomes automatically operative by the grant of the license; but the subsequent user does not thereby secure the right to copy the perforated rolls or records. He cannot avail himself of the skill and labor of the original manufacturer of the perforated roll or record by copying or duplicating the same, but must resort to the copyrighted composition or sheet music, and not pirate the work of a competitor who has made an original perforated roll." At 297.

*Accord,* Standard Music Roll Co. v. F. A. Mills, Inc., 241 F. 360, 363 (3rd Cir. 1917).[9] Cf. Jeweler's Circular Publishing Co. v. Keystone Publishing Co., 281 F. 83, 95 (2nd Cir. 1922); Produce Reporter Co. v. Fruit Produce Rating Agency, 1 F.2d 58 (N.D.Ill.1924).

■■ Rosner asserts that the courts have recently recognized a "right to copy" i. e., duplicate, which she is entitled to invoke. None of the cases she cites supports her claimed right to make exact and identical copies of appellants' records. In Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), the Supreme Court held only that business competitors could commercially produce an item "substantially identical" to an item produced by another company, but unprotected by patent or copyright, without fear of liability under state unfair competition laws. In

---

8. Given our view that exact duplication is not "similar use," we need not decide when a prospective licensee must invoke the compulsory license scheme and file his notice of intention to use.

9. *See* Ball, The Law of Copyright and Literary Property 461 (1944); Note, "Battle

over the Compulsory License: Mechanical Recording of Music," 36 Colum.L.Rev. 501, 503 (1964); Diamond, "Copyright Problems of the Phonograph Industry," 15 Vand.L.Rev. 419, 426 (1962); Note, 13 Rutgers L.Rev. 365, 368 (1958).

both *Sears* and *Compco* the products at issue were unprotected by patent. The "Paladin" character in Columbia Broadcasting System, Inc. v. DeCosta, 377 F. 2d 315 (1st Cir. 1967), was likewise unprotected by a copyright. As we said in Cable Vision, Inc. v. KUTV, Inc., 335 F. 2d 348, 351 (9th Cir. 1964),

> "*Save for the limited protection accorded the creator of literary and intellectual works under the Copyright Act* and its exceptions . . . , anyone may freely and with impunity avail himself of such works to any extent he may desire and for any purpose whatever *subject to the qualification that he does not* steal good will, or, perhaps more accurately stated, *deceive others in thinking the creations represent his own work.*" (emphasis supplied.)

*Sears* and *Compco* do not sanction Rosner's outright appropriation, in violation of copyright, of the actual performances contained on appellants' records. Rosner may, of course, record appellants' songs, when she hires musicians, artists, and technicians. Instead, she steals the genius and talent of others. She deceives others into thinking that her tapes represent her own work.[10] She has no "right to copy." *See* Capitol Records, Inc. v. Greatest Records, Inc., 43 Misc.2d 878, 252 N.Y.S.2d 553 (S.Ct. 1964). She may not continue her piracy under the flag of compulsory licensing.

Reversed and remanded.

BYRNE, Senior District Judge (dissenting):

I respectfully dissent.

My disagreement with the majority opinion is that it sanctions relief which I do not believe is available to these appellants. The basis of this disagreement is in differing interpretations as to what is truly in issue. In my view, the appellants are not seeking to protect the copyrights they hold on the musical compositions in controversy. This is not a case, as I see it, where the holders of the copyright are seeking retribution for the uncompensated use of their musical compositions. Rather, this conflict may be seen as an attempt by these copyright holders to preclude *forever*, Rosner's appropriation of their *recordings* of these compositions. The majority opinion's approval of such a consequence discounts, as I see it, Rosner's subsequent compliance with the compulsory license provisos. It is to that consequence to which my views, as were those of the district court, are directed.

The legislative history of the recently enacted amendments to the Copyright Act serves as an instructive guide setting forth the limitations of the Act at the time the events in controversy occurred.

In its report on the bill amending the Copyright Act, the House Judiciary Committee observed that because "there [was] no Federal protection of sound recordings, as such," new legislation was needed. Absent such protection, the Committee noted that if record pirates "satisfy the cla[i]m of the owner of the musical copyright [they] can and do engage in widespread unauthorized reproduction of phonograph records and tapes *without violating Federal copyright law.*" (emphasis supplied). H.R. 92–487. The view propounded by the House Judiciary Committee was echoed by the Librarian of Congress: "Neither the present Federal copyright statute nor the common law or statutes of the various states are adequate for this purpose. [Controlling unauthorized duplication of phonograph records and tapes]. The best solution, an amendment of the copy-

---

10. It has long been the law in this Circuit that "[o]ne cannot copy the substance of another's work without infringing his copyright." Benny v. Loew's Inc., 239 F. 2d 532, 537 (9th Cir. 1956). *See also* Berlin v. E. C. Publications, 329 F.2d 541 (2d Cir. 1964); Columbia Pictures Corp. v. National Broadcasting Co., 137 F.Supp. 348 (S.D. Calif. 1955). Under the Copyright Act, if the copying is "substantial," it is an infringement. Comment, "Piracy or Parody: Never the Twain," 38 U.Col. L.Rev. 550 (1966). Rosner's copying is exact.

right law to provide limited protection against unauthorized duplication, is that embodied in S. 646 [the bill to amend Title 17 of the United States Code.]" Similarly, the State Department, which has had to deal with international consequences of record piracy, concluded that the pre-amended Act was inadequate: "At present, there is no Federal statute that expressly prohibits commercial traffic in unauthorized duplications of legitimate sound recordings. [The bill to amend Title 17 of the United States Code] would answer that need and would provide a satisfactory means of combating and curbing the unauthorized duplication and piracy of sound recordings." The Commerce and Justice Departments also attested to the inadequacies of the pre-amended Act. In light of the views expressed by the representatives of the Executive and Legislative Branches, I cannot agree with the essence of the majority opinion that the Copyright Act in its pre-amended state adequately safeguarded the rights of the instant appellants. Accord, Nimmer on Copyright (1970) wherein it is stated:

"Assuming such a record pirate duly serves a notice of intent to use, and pays the compulsory license royalties, the somewhat astounding result is that *he is not an infringer under the Copyright Act.* The only portion of that which he has recorded which is protectible under the Copyright Act *is the musical composition itself, and that he is authorized to use for recording purposes upon payment of the statutory royalties.* All of the other elements contained in the original record *which he has without authority duplicated are not copyrightable,* and hence his use of such other elements does not give rise to an action for copyright infringement." at 430, 431. (emphasis supplied).

As demonstrated by a recapitulation of the amendments' legislative history, the act of record piracy was not prohibited by the pre-amended Act if the compulsory license provisions had been satisfied. I believe the trial court's interpretation of the statutory provisos and

court promulgated rules pertinent to the disposition of Rosner's recording equipment was entirely consistent with the then governing law. Simply stated, the trial court's sound application of the rule of *ejusdem generis* avoids the contradictory result of impounding recording equipment and at the same time affirming that the pre-amended Act permits duplication of recording if the compulsory license provisions are met with compliance:

"The rules of practice implementing sections 101(c) and (d), with one exception, use terminology similar to that of section 101(d).

"While recognizing that this ambiguous language admits of several interpretations, this Court can only conclude that the most reasonable one precludes the seizure and impounding of defendants' tape recording machinery and equipment. Application of the rule of *ejusdem generis* requires that the phrase 'or other means of making such infringing copies' be held to apply only to the same general class as are those items specifically enumerated in the phrase immediately preceding, and each of the preceding enumerated items—plates, molds, matrices—is of such a particular character as to embody, as defendant suggests, an identifiable impression of the copyrighted work.

"Furthermore, if eventual destruction is one of the purposes of impounding, see Jewelers' Circular Publishing Co. v. Keystone Publishing Co., 274 F. 932 (S.D.N.Y.1921), *this Court can conceive of no rationale within the wording of the Act which would justify destruction of any property usable for other, non-infringing purposes.*"

In so applying the said rule, the trial court ordered that "all property which either embodies a mechanical and/or electronic impression of plaintiff publishers' copyrighted works or any packaging or promotional devices identifying or referring to same are still subject to impoundment." Thus, the net result of the court's confiscation order was to

deny Rosner the fruits of her noncompliance with the compulsory license provisions without rendering as meaningless any subsequent compliance.

If this case only concerned a pirate who had not complied with the compulsory license provisions, I would be in complete accord with the majority opinion's view that duplication was prohibited. Here, Rosner, an acknowledged duplicator, is not such a pirate, because, as noted by the majority opinion, she had "filed a notice of intention to use, declaring her intention to continue the manufacture of tapes by the same duplicating methods used in the past." Because I believe this to be the very "loophole" the *new* amendments are intended to close, I cannot concur in the majority opinion's disposition of the compulsory license issue.

Although Rosner now has complied with the compulsory license provision, she is prohibited by the majority opinion from engaging in the act of duplication. Such a prohibition is not tenable, as I see it, in light of the legislative history of the amendments and the views of Professor Nimmer.

I would affirm the district court.