GOODWIN, Circuit Judge.
Emmylou Harris, a singer, recovered a money judgment and injunctive relief against the defendants for infringing her copyrights in certain songs. Defendants appeal.
In 1968, Harris entered into a written agreement with Jay-Gee Record Company in which she agreed to record songs in exchange for royalties equalling 3% of the net retail list price of each record sold. Pursuant to the agreement, she recorded six songs which were released by Jay-Gee on an album entitled Gliding Bird.
Five of the songs were written and composed by Harris. The copyrights to each of these compositions were held in the names of Hannah Brown Music (a company wholly owned by Harris), Nanshel Music and Jubilant Music. In 1969, all three companies issued mechanical licenses to Jay-Gee. Under the 1909 Copyright Act then in force,[1] such licenses are necessary to enable one to duplicate a musical composition copyrighted by another.
The sixth song, entitled “Gliding Bird,” was composed by Tommy Slocum. The copyright originally was incorrectly registered in the name of Hannah Brown Music. On September 19, 1969, Hannah Brown assigned it to Nanshel Music and the assignment was recorded in the Copyright Office. On the same day, Slocum wrote to Nanshel setting forth an understanding which provided in part “I have written and composed the musical composition ‘GLIDING BIRD’ *1332 which your company has copyrighted, and which will be registered with BMI with you as publisher.” In 1980, Nanshel assigned its copyright interest to Hannah Brown.
In 1971, Jay-Gee filed a petition for bankruptcy. A year later, Jay-Gee’s trustee in bankruptcy sold parts of Jay-Gee’s assets — including the master tape of the six songs comprising the Gliding Bird Album— to defendant Suellen Productions, Inc. Suellen then transferred whatever rights it had acquired to manufacture and distribute the recordings on the Gliding Bird album to defendant Emus Recordings. Emus re-released a duplicate of the Gliding Bird album in 1979 with a new serial number and a different cover.
Defendant Roulette Records, Inc. was licensed by Suellen and Emus to license foreign sales of the Gliding Bird album. Roulette provided a master to foreign manufacturers who were to manufacture and distribute the album.
Harris has never received any royalties for the Gliding Bird album from the defendants. In November 1979, she demanded that defendants cease the manufacture and distribution of the songs. She then sued defendants for copyright infringement. With respect to the song “Gliding Bird”, the district court granted summary judgment in favor of Harris and subsequently enjoined defendants from further infringing the song “Gliding Bird.” After a bench trial, the court found that the defendants had infringed the copyrights of the remaining five songs. Appeals from the two judgments are consolidated.

1. Did Defendants Acquire A Valid Mechanical License from Jay-Gee?

The threshold question in this case, and one which defendants claim requires a trial, is whether Suellen acquired a valid mechanical license to duplicate the song when it purchased Jay-Gee’s assets in bankruptcy. Defendants argue that when Suellen purchased the master tape of Gliding Bird from Jay-Gee’s trustee, Suellen also acquired Jay-Gee’s license to manufacture and distribute the recording. It is defendants’ position that Jay-Gee had two negotiated licenses to use the musical composition “Gliding Bird”, the one contained in the Harris/Jay-Gee Recording Agreement and the one contained in the Nanshel Agreement, and that both were assignable by the licensee Jay-Gee. Which license was valid depends on which party properly held the copyright to the composition. At most, defendants contend they may have breached a contract but they did not infringe a copyright.

A. The Song “Gliding Bird”

The defendants contend that the court erred in granting summary judgment with respect to copyright infringement of the song “Gliding Bird” because of the existence of genuine issues of material fact.
Paragraph 10 of the Harris/Jay-Gee Recording Agreement reads as follows:
In the event you [Harris] record a musical selection in which you have an interest, direct or indirect, in such musical selection or any copyright thereof, the copyright royalty payable by us [Jay-Gee] on such musical selection shall be 1V2$ per selection per record side. We [Jay-Gee] shall not pay any copyright royalty on a Public Domain selection recorded by you [Harris] in which you have any interest, direct or indirect, or in any copyrighted arrangement thereof.
Defendants argue that the Agreement created rights between the parties which were freely assignable. Plaintiff, on the other hand, argues that the contract did not contain a license, but merely an agreement as to a royalty rate if Jay-Gee received a license. No references to the song “Gliding Bird”, to accounting terms or to other provisions which one would expect to find in a license are contained in paragraph 10.
The district court expressly avoided deciding whether the contract was a license, holding that in any event the rights transferred under the agreement were unassignable as a matter of law because the agreement was for plaintiff’s personal services. *1333 The agreement is only relevant if it contained a mechanical license. If it did, then Jay-Gee acquired the rights accorded a licensee.
In addition, Jay-Gee obtained a mechanical license from Nanshel, which read in part:
[Y]ou shall have all the rights which are granted to, and all the obligations which are imposed upon, users of said copyrighted work [“Gliding Bird”] under the compulsory license provision of the Copyright Act.... This license covers and is limited to one particular recording, or phonograph records only, of the musical composition set forth above as performed by the artist on the record number set forth above....
The district court found that this license was unassignable as a matter of law, presumably because it was a compulsory license.[2]
Defendants contend that the license could not in fact have been a compulsory license because it authorized first use of the composition while compulsory licenses apply “only to the second and subsequent recordings of a musical work, after the copyright owner has authorized a first recording to be made.” Recording Industry Association of America v. Copyright Royalty Tribunal, 662 F.2d 1, 4 (D.C.Cir.1981). They argue that both this license and the one contained in the Harris/Jay-Gee Recording Agreement were negotiated licenses, properly controlled by contract law and freely assignable. Because we decide the issue on other grounds, we need not determine whether or not the license was compulsory. Whether or not the contracts were negotiated or compulsory, and did or did not involve personal services, the ultimate question is whether copyright licenses can be transferred by a mere licensee.
The transferability of a copyright license appears to be a question of first impression in this circuit. There is, however, authority to support the proposition that such licenses are not transferable as a matter of law. Under the 1909 Act,
Absent any contractual limitations, an assignee [of the whole contract] had the right to re-assign the work. A licensee, however, had no right to re-sell or sublicense the rights acquired unless he has been expressly authorized to do so.
M. Nimmer, Nimmer on Copyright § 10.-01[c][4] (1983) (footnotes omitted).
It has been held that a copyright licensee is a “bare licensee ... without any right to assign its privilege.” Ilyin v. Avon Publications, Inc., 144 F.Supp. 368, 372 (S.D.N.Y.1956) (citations omitted); Mills Music, Inc. v. Cromwell Music, Inc., 126 F.Supp. 54 (S.D.N.Y.1954).
Where precedent in copyright cases is lacking, it is appropriate to look for guidance to patent law “because of the historic kinship between patent law and copyright law.” Sony Corp. of America v. Universal City Studios, — U.S. -, 104 S.Ct. 774, 787, 78 L.Ed.2d 574 (1984) (footnote omitted). A patent license has been characterized as “a naked license to make and sell the patented improvement as a part of its business, which right, if it existed, was a mere personal one, and not transferable, and was extinguished with the dissolution of the corporation.” Hapgood v. Hewitt, 119 U.S. 226, 233, 7 S.Ct. 193, 197, 30 L.Ed. 369 (1886); See also Unarco Industries, Inc. v. Kelley, Co., 465 F.2d 1303 *1334 (7th Cir.1972), cert. denied, 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973), and citations therein.
Such an interpretation of a license accords with the policies underlying enactment of the Copyright Act. The legislative history reveals an acute awareness of the need to delicately balance competing interests. On the one hand, there was a strong reluctance to allow a monopolization of works or compositions; at the same time, there was an awareness of the necessity of preserving the rights of authors and composers in order to stimulate creativity. H.R.Rep. No. 2222, 60th Cong., 2d Sess. 7 (1909).
Illustrative of the compromises adopted is the compulsory licensing provision which permitted the copyright holder to control first use while providing a mechanism for others to obtain licenses once first use had been authorized. The notice provision for compulsory licenses insures that the copyright owner can monitor use in order to determine that accountings are accurate. The same consideration is relevant here. By licensing rather than assigning his interest in the copyright, the owner reserves certain rights, including that of collecting royalties. His ability to monitor use would be jeopardized by allowing sublicensing without notice. In fact precisely such a scenario underlies this litigation.
Amicus Recording Industry of America argues that the purchase of master recordings at bankruptcy sales is a common practice of the recording industry. It urges that whether or not a copyright license is otherwise transferable, it does pass to the bankruptcy trustee under the provisions of the Bankruptcy Act. We disagree.
Section 70(a)(2) of the Bankruptcy Act of 1898, codified as 11 U.S.C. § 110(a)(2) (1976),[3] provides that “interests in patents, patent rights, copyrights and trademarks, and in applications therefor” are vested in the bankruptcy trustee. We are called upon to decide whether “interests” in this context include licenses.
Under patent law, a license has been characterized as an agreement not to sue the licensee for infringement. United States v. Studiengesellschaft Kohle, m.b.H., 670 F.2d 1122, 1127 (D.C.Cir.1981); Western Electric Co. v. Pacent Reproducer Corp., 42 F.2d 116, 118 (2d Cir.1930). As such, a license conveys no proprietary rights in the patent. Bell Intercontinental Corp. v. United States, 381 F.2d 1004, 1010, 180 Ct.Cl. 1071 (1967), and cases cited therein. We hold therefore that for the purposes of § 70(a)(2) a license is not an interest in a copyright.
Section 70(a)(5) of the Bankruptcy Act provides for the transfer of all assets which the bankrupt “could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded or sequestered” prior to the petition for bankruptcy. Because a copyright license can not be transferred by the licensee without authorization, it falls outside the reach of this provision. Although defendants obtained the master tapes, they did not thereby obtain a license to mechanically reproduce them.

B. The Harris Compositions

Included on the Gliding Bird Album were five songs written and composed by Harris: “Fugue for the Ox”, “Bobbie’s Gone”, “Clocks”, “Black Gypsy” and “Waltz of the Magic Man”. Mechanical licenses to duplicate these songs had been issued to Jay-Gee by the joint copyright owners: Hannah Brown, Nanshel Music and Jubilee Music. No new mechanical licenses were obtained for the songs at issue by defendants at the time they released the album, nor were any royalties paid to Harris.
While there were ambiguities in the original mechanical licenses and the parties disagree as to whether they were compulsory or negotiated licenses, no one con *1335 tends that they in any way constituted an assignment of the copyright interest. As indicated above in relationship to the song “Gliding Bird”, copyright licenses cannot be transferred without explicit authorization in the agreement. The release of the new album, without new mechanical licenses, constituted copyright infringement for which defendants are liable.

2. Damages

The District Court awarded damages of $60,000 to plaintiff for copyright infringement. The infringing actions in these cases occurred between 1979 and 1981 and are controlled by the new Copyright Act of 1976. 17 U.S.C. § 301(a).
Under the 1976 Act, the plaintiff, may, prior to final judgment, elect to recover either actual or statutory damages. 17 U.S.C. § 504(c)(1). Statutory damages may be elected whether or not there is adequate evidence of the actual damages suffered by plaintiff or of the profits reaped by defendant. 3 M. Nimmer, supra, § 14.04[A]. Where statutory damages are elected, the trial court may, in its discretion, award between $250 and $10,000 for each act of infringement. 17 U.S.C. § 504(c)(1). If the court finds the infringement to have been wilful, the maximum award is increased to $50,000. 17 U.S.C. § 504(c)(2).
The court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima. L.A. Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 39 S.Ct. 194, 63 L.Ed. 499 (1919).[4] The award will be overturned only for abuse of discretion. See Russell v. Price, 612 F.2d 1123, 1131-32 (9th Cir.1979), cert. denied 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980). The district court awarded for each of the six infringed songs the maximum damages permissible, in the absence of a specific finding of wilfullness. The trial court is in a better position than are we to determine appropriate damages. We affirm that decision.
Similarly, we find no abuse of discretion in the award of $34,152.97 in attorneys’ fees. The 1976 Act permits the award of fees to the prevailing party. The amount in this case represented approximately half of the amount plaintiff’s attorneys claim to have earned in this rather extensive litigation.

3. Subsidiary Issues

Defendants urge that the song “Gliding Bird” has entered the public domain because of inaccuracies in the copyright registration. The song was originally registered listing Emmylou Harris as the author. The copyright was later transferred to Nanshel at the same time that the actual author of the song, Tommy Slocum, executed a transfer agreement with Nanshel. The copyright was later assigned to Harris in preparation for the present litigation.
Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement. Testa v. Janssen, 492 F.Supp. 198 (W.D.Pa.1980); Urantia Foundation v. Burton, 210 U.S.P.Q. 217, 220 (W.D.Mich.1980); Urantia Foundation v. King, 194 U.S.P.Q. 171, 174-175 (C.D.Cal.1977). While the 1909 Copyright Act makes no provision for correcting mistakes in copyright registrations, plaintiffs did in fact effectuate the necessary correction through transfers of interest. Furthermore, defendants have made no showing that they have been prejudiced in any way by the incorrect original registration.
Defendants further contend that plaintiffs are barred from bringing an infringement action by their failure to file a notice of use as required under § 1(e) of the 1909 Act.[5] Such notice was intended to *1336 put the public on notice that the musical composition had been used and was therefore available for compulsory licensing. The requirement was deleted from the 1976 Act. Infringing acts of the present action occurred after the passage of the 1976 Act, which has no such notice requirement. We have found no cases which suggest that failure to file under the 1909 Act should bar relief under the new, nor can we see a reason for such a proposition. Therefore, the action is not barred.
Plaintiff requests that she be given possession of the master tapes now held by defendants. The ownership of the copyright is separate and independent from ownership of the material object in which it is embodied, 17 U.S.C. § 202. Harris has no possessory interest in the masters.[6] Ownership of the tapes was properly transferred to and is now held by defendants; at issue here is only the use to which these tangible embodiments may be put. While defendants are hereby precluded from in any way reproducing the masters, they are entitled, to paraphrase the amicus, to listen to them on their own home stereo systems.
Defendants assert that they should be able to offset any monies advanced to Harris by Jay-Gee against royalties owed by defendant to Harris. Because we hold that defendants did not have a mechanical license, they are not entitled to an offset.
After careful review, we find defendant’s remaining arguments to be without merit.
This court will retain jurisdiction for the purpose of awarding reasonable attorneys’ fees to appellee upon submission of supporting documentation. 17 U.S.C. § 505.
Affirmed.

. Section 1(e) of the 1909 Act reserves to the copyright holder the right "to make any arrangement or setting [of a copyrighted musical composition] or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced ..." for the purposes of copying or vending the copyrighted work. Copyright Act 1909, codified at 17 U.S.C. §§ 1-216 (1976), hereinafter referred to as the 1909 Act. It has been, superseded by the Copyright Act of 1976, Pub.L. No. 94-553, 90 Stat. 2541, codified at 17 U.S.C. §§ 101-810 (Supp. V 1981) which became effective January 1, 1978, and is hereinafter referred to as the 1976 Act. Licenses to duplicate the sound recording are generally termed "mechanical licenses.”

. The compulsory licensing provision, §§ 1(e) and 101(e) of the 1909 Act (now codified with modifications as 17 U.S.C. § 115 (Supp. V 1981)), provided in part:
as a condition of extending the copyrighted control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof....
17 U.S.C. § 1(e) (1976).
In fact, compulsory licenses are not applicable to duplication of an existing recording. Duchess Music Corp. v. Stern, 458 F.2d 1305, 1310 (9th Cir.) cert. denied 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972).

. The Bankruptcy Act was repealed by the Bankruptcy Reform Act of 1978, P.L. 95-598, 92 Stat. 2549, 2682. The Bankruptcy Act continues to apply to this case. Id., § 403(a).

. Although Westermann arises under the 1909 Act, it applies equally to the 1976 Act. Nimmer On Copyright § 14.04[B] at 14-24.

. "It shall be the duty of the copyright owner, if he uses the musical composition himself for the manufacture of parts of instruments serving to reproduce mechanically the musical work, or *1336 licenses others to do so, to file notice thereof, accompanied by a recording fee, in the copyright office, and any failure to file such notice shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright.” 17 U.S.C. § 1(e) (1976).

. In fact Harris had specifically relinquished all rights to the masters by language in the Jay-Gee Recording Agreement which read "All recordings and all records and reproductions therefrom, together with the performances embodied therein, shall be entirely our property free of any claims whatsoever by you...." The 1909 Act only recognized copyrights in the underlying composition, not in a performance. See Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). This language does not constitute an assignment of a copyright interest.